clajon 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 





NO. 3-91-268-CV






HECI EXPLORATION COMPANY,



 APPELLANT



vs.






CLAJON GAS COMPANY, CLAJON GAS COMPANY, L.P.,


AND CLAJON MANAGEMENT COMPANY, INC.



 APPELLEES



 




FROM THE DISTRICT COURT OF FAYETTE COUNTY, 155TH JUDICIAL DISTRICT



NO. 87-519, HONORABLE DAN R. BECK, JUDGE PRESIDING



 




 Appellant HECI Exploration Company sued appellees Clajon Gas Company, Clajon
Gas Company, L.P., and Clajon Gas Management, Inc. (1) for breach of a take-or-pay contract. 
Clajon counterclaimed for a declaration of its rights and obligations under the contract. After a
series of summary judgment hearings and orders, the trial court rendered final summary judgment
for Clajon. HECI appeals. We will reverse the judgment and remand the cause to the trial court.


THE CONTROVERSY


 On May 31, 1982, Clajon Gas Company entered into a Gas Purchase Contract (the
"Contract") (2) with Humble Exploration Company, HECI's predecessor in interest. The Contract
set forth the rights and duties of the parties as follows:

 1.  Clajon agreed to take a specified minimum amount of gas produced during each
accounting period from certain HECI leases in Fayette County, Texas. 

 2.  Clajon agreed that if it failed to take the specified minimum amount of gas, it
nevertheless would pay HECI for the deficiency, provided HECI made a request for payment and
supplied supporting data for the request. 

 3.  If Clajon was obliged to make such a payment for gas it did not actually receive
during an accounting period, it could withhold payment for quantities it received in a subsequent
accounting period, as long as those quantities were in excess of a daily minimum amount specified
in the Contract. 

 4.  If Clajon had paid for gas it had not received when the Contract expired
December 31, 1984, during the next year Clajon could under certain conditions take an amount
of gas equal to the unrecovered balance of the prepayments. If a designated well was incapable
of producing an amount of gas sufficient to make Clajon whole, or if Clajon had not recovered
enough gas within the following year to satisfy the prepayment, HECI was obliged to refund the
balance of the prepayment.

 5.  Clajon agreed to design and operate a low-pressure pipeline system that would
permit HECI to deliver gas at a specified maximum wellhead pressure.

 On November 26, 1984, Clajon notified HECI that it intended to terminate the
Contract on December 31, 1984, as Clajon was entitled to do. On December 14, 1984, HECI
sent Clajon an invoice requesting payment for alleged "deficient takes" under the Contract. HECI
also requested payment for loss of gas it allegedly suffered because of Clajon's failure to construct
the low-pressure pipeline. Clajon did not pay such sums.

 In late 1984 or early 1985, the parties began negotiating for a second contract. 
After a series of offers and counteroffers, HECI accepted Clajon's offer, subject to approval by
the bankruptcy court overseeing HECI's affairs. Although the record is not clear in this regard,
the bankruptcy court apparently never approved the second contract (the "1985 Contract").

 In March 1987, HECI sued Clajon Gas Company. A year later HECI amended its
petition to add Clajon Gas Company, L.P., and Clajon Management, Inc. as defendants, alleging
each was an alter ego of Clajon Gas Company used to defraud HECI. HECI also alleged in its
petition that Clajon breached the Contract by "failing to honor the take-or-pay obligations of the
contract" and by failing to design and operate the low-pressure pipeline.

 Clajon responded with a general denial of HECI's claims and a counterclaim for
declaratory judgment setting forth the parties' respective rights and obligations under the Contract. 
Clajon also asserted seven affirmative defenses and failure of a condition precedent.

 In September 1988, Clajon filed its first motion for summary judgment, asking the
trial court to construe the Contract. While the summary-judgment motion was pending, HECI
filed a motion to disqualify Clajon's counsel, the law firm Godwin, Carlton & Maxwell ("G, C
& M"). HECI alleged that Dennis Olson, an attorney for G, C & M, had represented HECI in
the same litigation before joining G, C & M. The trial court overruled HECI's motion, and both
this Court and the supreme court overruled HECI's motions for leave to file petition for writ of
mandamus.

 On May 25, 1990, the trial court considered summary judgment motions by both
parties. The court denied in its entirety HECI's motion for summary judgment. The court
granted Clajon's motion as to the issue of "deficient takes" of gas; the court did not rule on the
issue of Clajon's failure to construct the low-pressure pipeline. On October 5, 1990, the trial
court granted Clajon's second amended motion for summary judgment, ordering that HECI take
nothing by its breach-of-contract claim concerning the low-pressure pipeline. The court therefore
ordered that HECI take nothing by its suit. (3)

 Both parties moved for summary judgment on Clajon's claim for attorney's fees. 
In December 1990, the trial court granted Clajon's motion for summary judgment concerning
attorney's fees and denied HECI's motion, thereby awarding Clajon nearly $175,000 in attorney's
fees as well as additional amounts if HECI appealed from the judgment.

 In March 1991, the trial court purportedly granted Clajon's "Notice of Nonsuit of
Counterclaims Related to Second Contract and Request for Entry of Final Judgment," whereupon
the court dismissed without prejudice the remainder of Clajon's claims relating to the counterclaim
and rendered final judgment. HECI appeals from this judgment, complaining of the trial court's
failure to disqualify Clajon's counsel and the court's rulings granting the three partial summary
judgments.



DISQUALIFICATION OF COUNSEL


 In its first two points of error, HECI contends the trial court abused its discretion
in failing to grant HECI's motion to disqualify Clajon's attorneys. HECI argues that the court's
ruling denied HECI due process of law under the federal and state constitutions because the
attorneys were disqualified as a matter of law. 

 Clajon offers two responses to HECI's argument: (1) Olson did not have a
"substantial relationship" with HECI; and (2) HECI waived its right to disqualify G, C & M by
waiting eleven months after learning of Olson's association with G, C & M before moving for
their disqualification. We will address each argument after setting forth the circumstances
necessary to analyze the arguments.

 Olson did not begin representing HECI until 1985; before that, however, he
represented the Brownings, a group who later succeeded to ownership of HECI. In his capacity
as counsel for the Brownings, Olson attended at least one meeting in which a HECI attorney and
a Brownings attorney discussed the merits of the 1985 Contract with Clajon. 

 Olson had no more contact with this controversy until October 1988 when a HECI
attorney, Hull Youngblood, called Olson and asked for his recollections of their discussions of
the 1985 Contract. Olson and Youngblood discussed the merits of HECI's claim, although it
remains unclear whether they discussed only the 1985 Contract or all the issues contained in
Clajon's supplemental answer and original counterclaim and its later motion for summary
judgment, which also presented issues pertinent to the 1982 Contract. Following the conversation
with Youngblood, Olson spoke briefly with HECI's president, Michael Starnes, about the
litigation. Finally, for a year after joining G, C & M, Olson retained possession of a HECI file
containing privileged information material to the case at bar.

 In November 1988, Donald Godwin of G, C & M approached Olson about merging
their law firms. When Godwin learned Olson represented HECI, he informed Olson that G, C
& M represented Clajon and that Olson would have to discuss the possible conflict of interest with
HECI. Upon learning that Olson wished to associate himself with Clajon's counsel, Starnes asked
Olson to request G, C & M to withdraw from representing Clajon. Godwin refused. When Olson
relayed this information, Starnes "literally said nothing," according to Olson. Olson testified that
he assumed this silence indicated acquiescence on the part of HECI.

 In January 1989, the month Olson joined G, C & M, HECI's attorney corresponded
with G, C & M attorneys about the potential conflict of interest. These discussions continued to
some extent throughout 1989. After Clajon filed its summary-judgment motion in September
1989, HECI filed in November 1989 its motion to disqualify Clajon's counsel.

 The trial court denied the motion to disqualify, after a hearing, in February 1990. 
At the end of the hearing the court set forth several of the reasons for its ruling:

 1. Olson did have some knowledge of the facts relating to the pending case.

 2. The case had come up for hearing on a motion for summary judgment before
HECI raised the issue of a conflict to the court.

 3. The delay in filing the motion to disqualify was "substantial" and exceeded the
appropriate date for filing such a motion.

 4. HECI continued to employ Olson in other legal matters after he joined
G, C & M, thereby expressing confidence in Olson and "some kind of acquiescence and trust of
his integrity." (4)

 5. Olson's association with G, C & M had caused HECI no injury, and no injury
was imminent.

 6. Disqualification of G, C & M would cause great expense to the parties.

 7. HECI's motion to disqualify "perhaps [had] become a negotiating tool in the
case."


Substantial Relationship 


 To determine whether disqualification of counsel is required, a trial court must
determine whether the matters within the pending suit are substantially related to factual matters
in the previous suit. NCNB Texas Nat'l Bank v. Coker, 765 S.W.2d 398, 399-400 (Tex. 1989). (5) 
In Coker, the supreme court outlined the factors for determining what constitutes a "substantial
relationship" between the attorney's two representations:



The moving party must prove the existence of a prior attorney-client relationship
in which the factual matters involved were so related to the facts in the pending
litigation that it creates a genuine threat that confidences revealed to his former
counsel will be divulged to his present adversary. Sustaining this burden requires
evidence of specific similarities capable of being recited in the disqualification
order. If this burden can be met, the moving party is entitled to a conclusive
presumption that confidences and secrets were imparted to the former attorney.



Id. at 400. Once the movant proves a substantial relationship between the former and the present
representations, an appearance of impropriety exists as a matter of law and the trial court should
disqualify counsel from further representation in the pending litigation. Id. 

 Olson and HECI had a previous attorney-client relationship. Clajon argues,
however, that Olson's connection with the present litigation is so minimal that it cannot constitute
a substantial relationship. We disagree. First, Youngblood and Olson discussed issues involved
in the case at bar while Olson was an attorney for HECI; this apparently led the trial court to
conclude Olson had some knowledge of the matters involved in the litigation. Although Clajon
asserts that the issues pertained only to the issues involving the 1985 Contract, the record is not
conclusive in that regard.

 Second, the Coker test apparently contemplates two distinct proceedings. In this
case, however, Olson did not represent HECI in one proceeding and then oppose it in a
subsequent proceeding; Olson represented both parties in the same proceeding. Because Olson's
representations of HECI and Clajon include identical facts, we perceive a danger that Olson could
divulge HECI's confidences to Clajon. See Home Ins. Co. v. Marsh, 790 S.W.2d 749, 753 (Tex.
App.--El Paso 1990, orig. proceeding). We do not believe the relationship has to rise to the same
level of involvement when an attorney shifts sides during the pendency of a single case as would
be required with two separate cases. See Enstar Petroleum Co. v. Mancias, 773 S.W.2d 662, 664
(Tex. App.--San Antonio 1989, orig. proceeding); Petroleum Wholesale, Inc. v. Marshall, 751
S.W.2d 295, 301 (Tex. App.--Dallas 1988, orig. proceeding). We conclude the facts demonstrate
a substantial relationship between Olson's former and subsequent representations.



Waiver of Right To Seek Disqualification


 Clajon next argues that, even if a substantial relationship existed, HECI waited too
long to bring the matter to the court's attention. We agree. 

 A party who fails to file its motion to disqualify counsel in a timely manner waives
the complaint. See Turner v. Turner, 385 S.W.2d 230, 236 (Tex. 1964); Enstar Petroleum, 773
S.W.2d at 664; see also Empire Life & Hosp. Ins. Co. v. Harris, 595 S.W.2d 904, 906-07 (Tex.
Civ. App.--Austin 1980, no writ). The facts of Enstar Petroleum are analogous to the facts here. 
In that case, the plaintiff Murry sued Enstar Petroleum, who was represented by the law firm
Atlas & Hall. David Hockema, a partner at Atlas & Hall, left the firm and started his own
partnership. Hockema later undertook representation of Murry without knowledge that Atlas &
Hall had represented Enstar Petroleum while he was a partner there. The court of appeals applied
the conclusive presumptions that (1) Enstar Petroleum had shared confidences with its Atlas &
Hall attorney, who shared those confidences with Hockema, and (2) Hockema shared his actual
knowledge with the members of his new firm. Enstar Petroleum, 773 S.W.2d at 664. 
Nevertheless, the court of appeals declined to disqualify the members of the new firm other than
Hockema, in part because Enstar Petroleum did not timely file its motion to disqualify. The court
of appeals deemed it significant that Enstar Petroleum had known of the conflict for months, but
filed its motion to disqualify on the day of trial. Id.

 HECI learned of Olson's association with G, C & M in December 1988 or January
1989. Yet HECI did not file a motion to disqualify counsel until November 1989, two months
after Clajon had filed its motion for summary judgment and eleven months after Olson joined G,
C & M. Hull Youngblood, HECI's attorney, conceded that he discussed a possible motion to
disqualify with HECI officials at various times in 1989; meanwhile, he participated during the
same period in at least six depositions concerning the case. Therefore, while G, C & M prepared
its case for trial, Youngblood and HECI delayed, debating whether and when they would file a
motion to disqualify. We believe this sequence supports the trial court's suspicion that the motion
to disqualify was "a negotiating tool." See Spears v. Fourth Court of Appeals, 797 S.W.2d 654,
658 (Tex. 1990, orig. proceeding) (stating that a party's motion to disqualify counsel had "all the
appearances of a tactical weapon"). (6)

 HECI argues it did not waive its motion to disqualify because it objected, in a
January 1989 letter, to G, C & M representing Clajon. HECI also engaged in "discussions" with
Clajon at various times in 1989 concerning the disqualification issue. Yet Youngblood admitted
G, C & M unequivocally refused to withdraw from the case from the very first, and never led
HECI to believe otherwise. We believe that had HECI been seriously concerned about its
confidences being disclosed by Olson, it would have moved for disqualification before allowing
G, C & M to depose witnesses and otherwise continue its representation at Clajon's expense for
eleven months. 

 The court in Spears was not called upon to decide the issue of waiver: "While we
condemn the dilatory filing of motions to disqualify, we do not reach the question of whether,
under the facts presented, the State's motion was dilatory or whether the late filing of a motion
is alone sufficient to deny it." Spears, 797 S.W.2d at 656 n.1. Faced with the issue whether a
late filing of a motion is alone sufficient to deny it, we conclude that it is under the circumstances
of this case. Cf. Conoco, Inc. v. Baskin, 803 S.W.2d 416, 420 (Tex. App.--El Paso 1991, orig.
proceeding) (stating that four-month period of inactivity sufficient to support finding of waiver).

 Courts "must adhere to an exacting standard when considering motions to disqualify
so as to discourage their use as a dilatory trial tactic." Spears, 797 S.W.2d at 656. In this cause,
the trial court denied the motion to disqualify counsel in part because the court suspected the
motion had become a negotiating tool. Considering the lengthy delay between Olson's joining G,
C & M and the filing of HECI's motion, we are inclined to agree. See id. at 658. We therefore
cannot say the trial court abused its discretion in denying the motion to disqualify Clajon's
counsel. We overrule the first point of error. (7)



Due Process Rights


 HECI also urges that the trial court's refusal to disqualify G, C & M violated its
due process rights under the federal and state constitutions. HECI cites no authority for its
contention other than a habeas corpus case in which the prosecutor representing the State at a
probation revocation proceeding had originally represented the defendant. Ex parte Spain, 589
S.W.2d 132 (Tex. Crim. App. 1979). In granting a petition for writ of habeas corpus, the court
of criminal appeals apparently based its holding on a criminal defendant's constitutional right to
reasonably effective representation by counsel. A party in a civil suit has no such constitutional
right. We overrule the second point of error.


SUMMARY JUDGMENT RULINGS


 In its third point of error, HECI contends the trial court erred in rendering 
summary judgment for Clajon. We understand HECI to argue as follows: Neither party
contended the Contract was ambiguous, and therefore, the trial court was obliged to confine itself
to the four corners of the Contract in interpreting the instrument. Because the trial court
obviously misconstrued the Contract, it must have erroneously considered parol evidence in its
interpretation of the Contract; if, on the other hand, the Contract was ambiguous, the trial court
erred because genuine issues of material fact existed. HECI points to nothing in the record that
indicates the trial court considered parol evidence.

 In order to decide this rather opaque point of error, we must first address the
remaining points of error four, five, and six, concerning the trial court's construction of the
Contract. Under each point of error, we will determine (1) whether the trial court misinterpreted
the Contract as a matter of law (2) or whether genuine issues of material fact exist under the rules
of Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548 (Tex. 1985).


"Gas Wells Allowables" Provision


 In its first partial summary-judgment order, the trial court determined that
"`Seller's Delivery Capacity' for each well covered by the Contract was limited by the allowable
for such well as established by the Railroad Commission of Texas." HECI contends in its fourth
point of error that this was error because (1) under the Contract terms, the parties did not limit
the Daily Contract Quantity to the daily allowable assigned by the Commission, (2) under state
law and Railroad Commission rules, the allowables were not a limit on production from HECI's
wells, and (3) Clajon failed to prove its taking of the Daily Contract Quantity would have been
illegal. 

 With regard to Clajon's purchase obligations, the contract provided as follows:



Buyer agrees to receive and purchase, or pay for if available for delivery and not
taken, and Seller agrees to deliver and sell to Buyer from Seller's Gas Reserves,
all subject to the limitations and conditions herein elsewhere provided, during each
Accounting Period, a quantity of Gas Well Gas equal to the aggregate of the Daily
Contract Quantities for each well connected to Buyer's pipeline system and for all
Gas which Buyer is obligated to accept.


The Contract provided that "Daily Contract Quantity" meant "eighty percent (80%) of Seller's
Delivery Capacity for [each] well." The Contract defined "Seller's Delivery Capacity" to mean,
in pertinent part, "the maximum quantity of Gas Well Gas which can be delivered to Buyer . . .
under and subject to all valid conservation rules and regulations of regulatory authorities."

 Taking these provisions together, it appears Clajon was obliged to take or pay for
eighty percent of all the gas HECI could deliver subject to "valid conservation rules" and
"regulations of regulatory authorities." Clajon construes the foregoing expressions to mean that
the Railroad Commission's daily allowables fixed a ceiling on the amount of gas Clajon was
obliged to take or pay for even if it did not take the gas. HECI maintains these contract
expressions do not unambiguously reflect an intent to limit Clajon's take-or-pay obligations to the
allowables assigned to each well by the Railroad Commission. We agree with HECI's
interpretation.

 The Contract does not explicitly state that the Daily Contract Quantity is limited
to the Railroad Commission allowables. Therefore, to support a summary judgment such a
meaning must appear in the Contract by necessary implication. We ascertain no such implication. 


 Although the Railroad Commission fixes a daily allowable (8) for each well, the
Commission may allow a well to overproduce or underproduce for a period of time in order "to
adjust the correlative rights and opportunities of each owner." Tex. Nat. Res. Code Ann.
§ 86.090 (Supp. 1992); see also Valero Transmission Co. v. Mitchell Energy Corp., 743 S.W.2d
658, 663 (Tex. App. 1987--Houston [1st Dist.], no writ). A well that has overproduced during
one six-month period may produce only a fractional amount of its daily allowable during the
following six-month period until it reaches a balance between its accumulated allowables and
accumulated monthly production. See id. § 86.090(d). On any one day, however, a well's
production may lawfully exceed the daily allowables. Moreover, unless the contract period
exactly matches two balancing periods in which the producer balanced overproduction and
underproduction, the accumulated production amount is not necessarily identical with the
accumulated daily allowables. A producer may overproduce in the balancing period in which the
contract ends, leaving the corresponding underproduction for the balancing period after the
contract expires. Therefore, HECI could have produced more than its daily allowables during the
period in question and yet remain within the Commission's regulations. (9) 

 Moreover, Clajon has referred us to nothing in the record that shows it paid for the
minimum amount of gas it was obligated to take under the Contract, regardless whether that
amount exceeded the daily allowables. The most that Clajon asserts in its brief is that "[d]uring
the term of the [Contract], Clajon Gas did take and pay for gas from the five wells." Even
assuming the daily allowables fixed the ceiling on Clajon's obligation to take or pay for gas,
Clajon has not shown as a matter of law that it took eighty percent of the daily allowables.

 To defeat HECI's point of error, the record would have to show first that Clajon
took and paid for, or paid for without taking, eighty percent of HECI's daily allowables. Clajon
has not made such a record showing. Second, Clajon would have to show that either (1) HECI's
production never exceeded the daily allowables, or (2) HECI balanced its overproduction on one
day or in one balancing period with underproduction in a subsequent day or balancing period. 
Clajon has not invited our attention to anything in the record showing HECI's production was in
balance with its allowables during the entire period in controversy, or that it balanced its
allowables from one period to the next. (10) 

 The Contract does not unambiguously limit Clajon's take-or-pay obligations to the
Commission's daily allowables. Clajon has not contended the contract is ambiguous in this
respect. Furthermore, nothing in the record suggests that Clajon took the minimum amount of
gas it was required to take even under its own interpretation of the Contract. Because Clajon has
not met its summary-judgment burden with respect to the issue of daily allowables, we sustain the
fourth point of error. See Nixon, 690 S.W.2d at 548.



Ratable Take and Proration Requirements


 In the first order granting partial summary judgment, the trial court explained its
ruling by stating that "[u]nder Article V, Paragraph 12 of the Contract, (11) Clajon was not required
to take or pay for any quantities in excess of those quantities which could have been lawfully taken
under the Texas Common Purchaser Act and the Railroad Commission ratable take requirements." 
In its fifth point of error, HECI contends the court erred in its construction of the Contract
because (1) federal law preempts the Common Purchaser Act and the Railroad Commission's
ratable take requirements, and (2) Clajon offered no summary-judgment proof that the Daily
Contract Quantity exceeded the amount of gas which Clajon could take pursuant to the Common
Purchaser Act and the Commission's ratable take requirements.

 We agree with HECI's second contention. Irrespective of whether applicable
statutes and regulations limited the Daily Contract Quantity, Clajon points to nothing in the record
showing it took or paid for the maximum amount allowed by the applicable statutes and
regulations. Moreover, HECI presented summary-judgment proof that "from 1982 through 1984
neither the Texas Common Purchaser Act nor the Railroad Commission . . . ratable take
requirements . . . were a limitation upon the amount of gas which HECI could produce from the
wells in question." We conclude Clajon has not established as a matter of law that the Common
Purchaser Act or the ratable take requirements limited its obligations under the Contract. We
therefore need not address the preemption issue. We sustain HECI's fifth point of error.

Time for Performance


 In its sixth point of error, HECI contends the trial court erred in finding conditions
precedent to Clajon's take-or-pay liability. The court stated in its order that Clajon's obligation
under the Contract to pay for deficient takes "was contingent upon and did not arise unless the
following two conditions occurred or existed": (1) HECI determined at the end of each
accounting period that there were deficient takes; and (2) at the end of each accounting period
HECI expressly requested that Clajon pay for such deficient takes and supported its request with
data demonstrating the deficiency. The trial court also supported its first partial summary
judgment order by stating that "[u]nder the Contract, time was of the essence to the provision of
the Contract concerning the determination of whether there were deficient takes and concerning
Clajon receiving HECI's request for payment for any such deficient takes." In its seventh point
of error, HECI contends the trial court erred by construing the Contract in the manner indicated.

 Nothing in the record purports to show whether HECI made a determination at the
end of each accounting period that Clajon had deficient takes. HECI did not provide Clajon an
invoice and supporting data at the end of each accounting period, but did so before the end of the
contract term. On that ground, the trial court granted summary judgment on HECI's claims for
deficiency payments. Therefore, the question presented is whether the Contract conditioned
Clajon's promise to pay, for gas not taken, on HECI's supplying Clajon with a timely request for
payment and supporting data at the end of each accounting period. 

 The Contract provides as follows:



4. At the end of each Accounting period:


 a. If Buyer shall have failed to take a quantity of Gas Well Gas equal to the
aggregate of the Daily Contract Quantities required of it hereunder during
such Accounting Period, then Buyer shall pay Seller, in accordance with
subparagraph b. immediately below, for that quantity of Gas Well Gas
equal to the difference between the aggregate Daily Contract Quantities
applicable to such Accounting period and the sum of (i) any quantities of
Gas Well Gas actually purchased and taken by Buyer from Seller
hereunder during such Accounting Period, and (ii) any quantities of Gas
Well Gas which Buyer was not required to take during such Accounting
Period by reason of force majeure (such quantity resulting from such
difference being herein called "deficient taking").


 b. If there is deficient taking as determined in subparagraph a. immediately
above, then Buyer shall pay for the deficiency as if taken, such payment
to be made within thirty (30) days after receipt of Seller's request therefor
and data supporting the amount requested at the average price per Mcf .
. . in effect during the time the deficient taking occurred.



 By its terms, the Contract imposed only one obligation regarding time of
performance: If at the end of an accounting period there was a deficient taking, Clajon had to pay
for its deficient takes within thirty days after receiving from HECI a request for payment and data
supporting the request. Nothing in the Contract expressly required HECI to request payment for
such deficiencies within a specified time. (12) Why then did the trial court read such a requirement
into the Contract? According to Clajon, the trial court imposed the condition precedent because
(1) the phrase "at the end of each accounting period" applied to HECI's obligations as well as
Clajon's obligations and (2) time was of the essence of the Contract. We disagree with both
arguments.

 Clajon argues that the Contract must have impliedly imposed a condition precedent
upon Clajon's obligation to pay for gas not taken because no other construction would give
meaning to the phrase "At the end of each Accounting Period." Further, Clajon argues, even if
the phrase "At the end of each Accounting Period" did not establish a condition precedent as to
all the wells, it certainly required HECI to submit invoices and supporting data before the end of
a succeeding accounting period. (13) Otherwise, argues Clajon, the phrase would have no meaning. 
We disagree with both arguments. By the very terms of the Contract, the phrase "At the end of
each Accounting Period" specifies when HECI's right to receive payment arose, not when it lost
its contractual right to payment. The Contract does not explicitly provide that HECI had to
request payment at the end of each accounting period, and we must avoid a construction of the
contract that would impose a condition precedent creating a forfeiture if another reasonable
reading of the contract is possible. See Criswell v. European Crossroads Shopping Ctr., Ltd., 792
S.W.2d 945, 948 (Tex. 1990) (stating that if a contract does not explicitly contain a condition
precedent, a court should, to prevent a forfeiture, construe the contract terms as establishing a
covenant rather than a condition precedent); Schwarz-Jordan, Inc. v. Delisle Constr. Co., 569
S.W.2d 878, 881 (Tex. 1978).

 Clajon argues next that time was of the essence of the Contract. As a rule, time
is not of the essence of a contract unless the contract so specifies, and a party's failure to perform
by some arbitrary date not contained in the contract is not a breach of contract. Gensco, Inc. v.
Transformaciones Metalurgicias Especiales, S.A., 666 S.W.2d 549, 553 (Tex. App.--Houston
[14th Dist.] 1984, writ dism'd); Laredo Hides Co. v. H & H Meat Prods. Co., 513 S.W.2d 210,
216 (Tex. Civ. App.--Corpus Christi 1974, writ ref'd n.r.e.). The clause in dispute contains no
language that time is of the essence. Nor do we find a clear implication in the Contract that time
is of the essence. See Superior Signs, Inc. v. American Sign Servs., Inc., 507 S.W.2d 912, 915
(Tex. Civ. App.--Dallas 1974, no writ) (stating that any intention to make time of the essence must
be clearly manifested in the contract). Clajon argues, however, that surrounding circumstances
of the Contract manifest an intent that time is of the essence. See Laredo Hides, 513 S.W.2d at
217 (if a contract does not provide expressly that time is of the essence, "there must be something
in the subject matter, or connected with the purpose, of the contract and the circumstances
surrounding it which makes it apparent that the parties intended that the contract be performed at
or within the time specified").

 First, Clajon contends time is of the essence in oil and gas transactions unless the
contract specifies to the contrary. In support of its contention, Clajon cites Investors Utility Corp.
v. Challacombe, 39 S.W.2d 175 (Tex. Civ. App.--Waco 1931, no writ). Clajon's reliance is
misplaced. Challacombe stated that time is of the essence "in oil and gas mining leases and
contracts for the drilling of oil and gas wells." Id. at 178 (emphasis added). The Challacombe
court based its holding on "the vagrant and fugitive nature of oil and gas, their liability to wander
or to be drawn elsewhere, if not developed." Id. The Contract at issue in the present case was
not a mineral leave nor a contract for the drilling of an oil or gas well; instead, it was for Clajon
to take a certain percentage of the gas HECI produced from its gas wells over a period of time. 
Therefore, the rationale underlying Challacombe is absent in the present case. Accordingly, we
disagree with Clajon's argument that time is of the essence of every contract involving an oil or
gas transaction. 

 Second, Clajon contends the circumstances and the language of the Contract clearly
indicate an intent to make time of the essence because HECI's delay would prevent Clajon from
asserting its make-up rights. We disagree. The Contract provides that if Clajon paid for gas it
did not take in any accounting period, it might take that amount of gas in subsequent accounting
periods without additional payment. If HECI's actions constituted a breach of the Contract,
Clajon's remedy was to take delivery of prepaid gas after the Contract term or sue for any
damages resulting from an inability to exercise its make-up rights. (14) Therefore, we need not
interpret the Contract as having an implied time-is-of-the-essence requirement in order to protect
Clajon's rights. Moreover, the absence of a specific time in which HECI had to present its claim
constitutes a strong indication that the parties did not intend time to be of the essence.

 Even if we assume the Contract imposed conditions precedent on Clajon's
obligation to pay, we do not agree Clajon is entitled to prevail as a matter of law. If a contract
does not specify a time within which a party must fulfill a condition precedent, as was the case
here, the law will imply that performance must occur within a reasonable time. Pearcy v.
Environmental Conservancy, 814 S.W.2d 243, 246 (Tex. App.--Austin 1991, writ denied). 
HECI's first demand for payment for alleged deficiencies did not occur until December 14, 1984;
this was approximately eighteen months after two of the first accounting periods ended and
approximately eight months after the other three initial accounting periods ended. Although
eighteen months, or even eight months, may have been an unreasonable period of time for HECI
to wait, we cannot say it was unreasonable as a matter of law. The question of how long after the
end of the accounting period HECI could wait before presenting the invoices is for the trier of
fact. See Price v. Horace Mann Life Ins. Co., 590 S.W.2d 644, 646 (Tex. Civ. App.--Amarillo
1979, no writ).

 Clajon had no obligation to pay before HECI complied with its obligations under
the Contract, but HECI's allegedly tardy performance did not as a matter of law excuse altogether
Clajon's obligation to pay for gas taken or not taken, the very substance of the take or pay
contract. See Restatement (Second) of Contracts § 242 cmt. b (1981); cf. Gulf Constr. Co. v.
Self, 676 S.W.2d 624, 630 (Tex. App.--Corpus Christi 1984, writ ref'd n.r.e.) (contract providing
that subcontractor would be paid when general contractor was paid merely created covenant
dealing with "manner of payment" or "terms of payment," rather than creating condition under
which subcontractor would not be paid at all unless general contractor was paid). Because of the
general rule that a contract must specifically provide that time is of the essence of a contract, we
will not infer such a term from contractual language unless the contract compels such a
construction. The circumstances surrounding the making of the Contract do not necessarily
compel the conclusion that the parties intended at the time of contracting that time was of the
essence. That HECI arguably did not abide by the terms of the Contract may give rise to a
breach-of-contract claim or defense, but it does not change the meaning of the Contract. We
sustain the seventh point of error.

 With regard to the first partial summary judgment, we conclude none of the four
grounds relied on by the trial court supports its summary-judgment order. We therefore sustain
points of error three through seven. Because of our disposition of those points of error, we need
not address the eighth point of error.



Low-Pressure Gas Claims


 The Contract provided with respect to low-pressure gas that Clajon "shall design
and operate a low-pressure pipeline system which will permit the delivery of Gas by Seller at a
maximum pressure of 60 psig and which will result in a suction pressure at each compressor
station of 25 psig." Clajon did not construct a low-pressure pipeline. HECI prayed for damages
allegedly arising from Clajon's failure to construct the pipeline. 

 In its order granting Clajon's second amended motion for summary judgment, the
trial court ordered that HECI "take nothing on its low-pressure breach of contract claim" and that
HECI's suit be dismissed with prejudice. In its ninth point of error, HECI contends generally that
the trial court erred in granting Clajon's second amended motion for summary judgment. We
agree.

 The summary-judgment order does not specify the grounds upon which it was
granted. Therefore, HECI must show that each of the independent grounds alleged in Clajon's
motion is insufficient to support the order. McCrea v. Cubilla Condominium Corp. N.V., 685
S.W.2d 755, 757 (Tex. App.--Houston [1st Dist.] 1985, writ ref'd n.r.e.). Clajon set forth two
independent grounds in its motion for summary judgment. First, it contended the Contract did
not impose any obligation to construct a low-pressure pipeline because HECI did not have
available gas "at a wellhead pressure of or less than 60 psig." Second, Clajon argued that HECI
could not prove damages as a result of Clajon's failure to construct the low-pressure pipeline
because (1) Clajon had no obligation to take a certain amount of low-pressure gas, but had only
to take a certain amount of gas without regard as to whether it was high- or low-pressure gas, and
(2) HECI did not timely notify Clajon of any deficient takes at the end of each accounting period. 


 The parties join issue primarily on the proper construction of the following
provision:



6. Subject to the availability of Gas from time to time at each Point of Delivery,
Buyer shall accept Gas for delivery hereunder at the pressure specified herein. 
With respect to lower pressure Gas (including stock tank vapors), Buyer shall
design and operate a low-pressure pipeline system which will permit the
delivery of Gas by Seller at a maximum wellhead pressure of 60 psig and
which will result in a suction pressure at each compressor station of 25 psig.



 Clajon argued in its motion for summary judgment that its obligation to design and
operate a low-pressure pipeline system was contingent upon there being available at a point of
delivery gas at a wellhead pressure of or less than 60 psig. Although we do not necessarily agree
with Clajon's construction of the Contract, HECI declined to challenge this construction in its
response to the summary-judgment motion. We shall therefore assume, as HECI apparently did,
that Clajon's obligation with respect to the construction of the pipeline was contingent upon the
availability of gas with a maximum wellhead pressure of 60 psig. See Tex. R. Civ. P. 166a(c)
("Issues not expressly presented to the trial court by written motion, answer or other response
shall not be considered on appeal as grounds for reversal."); City of Houston v. Clear Creek Basin
Auth., 589 S.W.2d 671, 678 (Tex. 1979).

 Despite HECI's apparent concession regarding the proper construction of the
Contract, Clajon had to show nevertheless that it was entitled to judgment as a matter of law. See
id. Clajon's summary-judgment proof consisted of scores of pages of technical gas-pressure data
purporting to show HECI never had available gas with a pressure less than 60 psig. Clajon has
not pointed to any affidavit or deposition testimony, expert or otherwise, explaining how to
interpret this data. We cannot agree the raw data establishes as a matter of law that HECI failed
to make available low-pressure gas, particularly since HECI provided its own technical data 
purporting to show it did make low-pressure gas available. 

 The only other summary-judgment proof supporting Clajon's position was an
affidavit in which a Clajon employee stated that "at all times prior to January 1, 1985, when gas
was flowing and received by Clajon from each of the five wells, the wellhead pressure was in
excess of 60 pounds per square inch gauge." HECI controverted this statement with affidavits of
its own witnesses, who testified that it did have available "gas at or below a pressure of 60 pounds
per square [inch] gauge." Because this is a review of a summary-judgment order, we must
assume HECI's contention is true. See Nixon, 690 S.W.2d at 548-49. Clajon argues on appeal,
however, that HECI's affidavits and charts have not raised a material issue of fact because HECI's
affidavits did not claim HECI had gas available at a wellhead pressure of 60 psig or less. 
According to Clajon, HECI's omission of the word "wellhead" renders its controverting evidence
a nullity. We disagree.

 We do not believe Clajon has established as a matter of law the absence of any
genuine issue of material fact as to one or more of the essential elements of HECI's cause of
action. Gibbs v. General Motors Corp., 450 S.W.2d 827, 828 (Tex. 1970). First, HECI
responded to Clajon's summary-judgment motion by asserting that it did have low-pressure gas
available at the points of delivery. HECI thus joined issue with Clajon on the issue of the
availability of low-pressure gas. We will not deny HECI's right to an adjudication of a disputed
fact issue simply because it failed to include the word "wellhead" in its response. Moreover,
Clajon has not explained the significance of the term "wellhead pressure" in its summary-judgment
documents or in its brief; it apparently assumes the meaning and significance of the term is self-evident. We do not share the assumption.

 Second, in its response to Clajon's summary-judgment motion, HECI alleged it had
low-pressure gas available at the point of delivery and filed documentary evidence purporting to
establish the fact. Clajon has made no attempt to show that HECI's gas-pressure charts were
based on a measurement taken somewhere besides at the wellhead. (15) 

 Third, the trial-court judgment impliedly assumes gas can have one pressure at the
wellhead and a lower pressure after arriving at the point of delivery. This may or may not be a
correct assumption; it is not for this Court to decide. The record does not reveal any basis for
such an assumption. Nor has Clajon addressed this issue on appeal. Instead, Clajon appears
content to argue on appeal only the naked contention that it is entitled to summary judgment
because HECI did not include the word "wellhead" in its summary-judgment proof when referring
to "gas at or below a pressure of 60 pounds per square [inch] gauge." 

 Finally, Clajon's implicit variable-pressure assumption leads to the result that as
long as the wellhead pressure was 60 psig or less, Clajon would have had to construct the pipeline
and accept the gas as low-pressure gas even if the pressure somehow rose sharply before it
reached the point of delivery. This appears inconsistent with Clajon's own appellate arguments
as to the parties' intent:



[T]he manifest intent of [the disputed provisions] is to allow for the purchase and
delivery of lower pressure gas if such gas was available from time to time. . . .
Unless there was lower pressure gas available for delivery into a low-pressure
pipeline system, the construction of such a system would have been a waste of
Clajon's resources and a useless act. (16)



 Without some basis in the record for Clajon's claim that the absence of the word
"wellhead" defeats HECI's point of error, we cannot agree Clajon has established its right to
judgment as a matter of law. We conclude Clajon has not shown its entitlement to summary
judgment based on the first ground set forth in its summary-judgment motion. We turn now to
the second ground.

 Clajon stated in its summary-judgment motion that it had no obligation to accept
any certain quantities of low-pressure gas; instead, it had only to accept a certain quantity of gas,
without regard to its pressure. Thus, argues Clajon, HECI cannot show harm from Clajon's
failure to take low-pressure gas. We reject this argument. Clajon has centered its entire argument
around its contention that it had to construct the low-pressure pipeline only if low-pressure gas
was available. The Contract provided that if such gas was available, Clajon "shall accept Gas for
delivery hereunder at the pressures specified herein." (emphasis added). HECI alleged low-pressure gas was available; because we must assume this statement is true for the purposes of this
appeal, we conclude Clajon was obliged to accept the gas. Moreover, although the Contract gave
Clajon the option of building a high-pressure pipeline "in addition to operation of the low-pressure
system" and accepting high-pressure gas, it also provided that "Buyer's right to accept Gas at the
higher pressures shall be in addition to, and not in substitution of, Buyer's obligation to accept
the delivery of low pressure Gas as described above."

 Finally, in its motion for summary judgment, Clajon stated that HECI could not
prove it suffered damages from Clajon's failure to design and operate the pipeline because HECI
did not timely notify Clajon of deficient takes during the preceding accounting period. We held
above that the issue of HECI's timeliness, in notifying Clajon of deficient takes, was not
established as a matter of law. Therefore, this ground fails as well. We sustain HECI's ninth
point of error. Accordingly, we need not address points ten and eleven.



Attorney's Fees


 The court below granted judgment that Clajon recover from HECI $174,001.25 in
attorney's fees, plus additional amounts if the case was appealed. In its twelfth point of error,
HECI contends the trial court erred in granting Clajon attorney's fees because Clajon had
wrongfully invoked the Uniform Declaratory Judgments Act (17) merely as a tool to recover
attorney's fees on disputes already pending in the trial court. We agree.

 In March 1987, HECI filed its original petition in this cause, alleging Clajon
breached the Contract with respect to the take-or-pay obligations and the low-pressure pipeline
construction. Clajon filed a general denial. At various times during the following year the parties
filed amended pleadings. In September 1988 Clajon filed a supplemental answer and original
counterclaim in which it first sought a declaration of the parties' rights and obligations, under the
Contract, concerning several issues. In February 1990, Clajon filed its third amended original
answer and amended counterclaim. That pleading interposed a general denial and several specific
denials; it also asserted twelve affirmative defenses, three counterclaims and three special
exceptions. One of the counterclaims was a request for a declaratory judgment setting forth
Clajon's rights and obligations under the Contract.

 HECI contends the matters on which Clajon sought a declaratory judgment were
nothing more than affirmative defenses to claims on which the parties had already joined issue. 
Therefore, argues HECI, the judgment awarding Clajon attorney's fees was improper because
Clajon's counterclaim was "a mere vehicle to recover attorney's fees." See Texas Liquor Control
Bd. v. Canyon Creek Land Corp., 456 S.W.2d 891, 895 (Tex. 1970) (stating that "an action for
declaratory judgment will not be entertained if there is pending, at the time it is filed, another
action or proceeding between the same parties and in which may be adjudicated the issues
involved in the declaratory action"); John Chezik Buick Co. v. Friendly Chevrolet Co., 749
S.W.2d 591, 595 (Tex. App. 1988, writ denied) (stating that the Uniform Declaratory Judgment
Act is not available to settle disputes already pending before a court); see also BHP Petroleum Co.
v. Millard, 800 S.W.2d 838, 841 (Tex. 1990).

 Clajon offers several responses to HECI's argument. First, Clajon argues HECI
failed to preserve error on this point by not taking special exception to the pleading requesting
declaratory-judgment relief. See Tex. R. Civ. P. 90; Hudspeth v. Hudspeth, 756 S.W.2d 29, 34
(Tex. App.--San Antonio 1988, writ denied); Narisi v. Legend Diversified Inv., 715 S.W.2d 49,
52 (Tex. App.--Dallas 1986, writ ref'd n.r.e.). We disagree. In both Hudspeth and Narisi, the
courts based their holdings on the complaining party's failure "to properly except or otherwise
raise the issue until after the judgment was signed." Hudspeth, 756 S.W.2d at 34 (emphasis
added); Narisi, 715 S.W.2d at 52. HECI apprised the trial court of its objection to Clajon's
attorney's-fees request in its response to Clajon's summary-judgment motion and obtained a ruling
on the issue. Therefore, it did not waive the point of error.

 Clajon also contends the relief it sought "was broader in scope and had greater
ramifications than the claims and defenses that were presented when the declaratory action was
filed." A party bringing a counterclaim may recover attorney's fees under the Uniform
Declaratory Judgments Act if its counterclaim is more than a mere denial of the plaintiff's cause
of action. See BHP Petroleum, 800 S.W.2d at 841-42. To have "greater ramifications" than the
original suit, the counterclaim should seek some sort of affirmative relief. Winslow v. Acker, 781
S.W.2d 322, 328 (Tex. App.--San Antonio 1988, writ denied).

 Clajon requested that the trial court declare its rights and obligations under the
Contract with respect to seven issues. Two dealt with conditions precedent to Clajon's obligation
to pay for deficient takes; two dealt with conditions precedent to Clajon's obligation to construct
the low-pressure pipeline; one dealt with the implied time-is-of-the-essence claim; and one dealt
with the alleged limitation of Clajon's contractual obligations by the Railroad Commission's daily
allowables. In none of these six issues did Clajon seek affirmative relief; it sought only to avoid
liability for deficient takes. In fact, these requested declarations were identical to affirmative
defenses set forth earlier in the same pleading. In the seventh issue, Clajon asked the court to
declare that, because Clajon could no longer make up any deficient takes, it was entitled to
recover a refund of all sums found owing to HECI. In another counterclaim in the same pleading,
however, Clajon alleged it was entitled to an offset for any items found owing to HECI because
of the absence of make-up rights. Thus, the declaratory-judgment counterclaim duplicated other
parts of the pleading in every respect. Clajon could not have recovered any compensation or
relief had HECI abandoned its causes of action or failed to establish them. See BHP Petroleum,
800 S.W.2d at 842. We therefore conclude that Clajon asked for no greater relief in its
declaratory-judgment counterclaim than it asked for without that counterclaim.

 Clajon apparently argues that because it had not requested the declaratory relief
prayed for in its September 1988 and February 1990 pleadings in any previous pleadings, it was
insignificant that its declaratory-judgment issues duplicated the affirmative defenses and
counterclaims contained in the same pleadings. We believe it immaterial whether the duplicative
affirmative defenses and counterclaims are in the same pleading or in a previous pleading. Either
way, the declaratory-judgment counterclaim presents no new controversies, but instead exists
"solely to pave an avenue to attorney's fees." John Chezik Buick, 749 S.W.2d at 595.

 The present case is distinguishable from BHP Petroleum and Winslow. In each of
those cases, the party seeking declaratory relief asked the court to determine its obligations and
rights in the parties' ongoing relationship. In the present case, the parties had no ongoing
relationship and Clajon sought no affirmative relief. As in John Chezik Buick, "the harm sued
upon was a one time occurrence that is fully covered by [HECI's] original suit." Id. at 595.

 Finally, Clajon contends the general rule prohibiting filing of a claim for
declaratory relief to recover attorney's fees applies only to cases in which there is already pending
a completely separate proceeding between the parties. Clajon argues that the rule is inapplicable
in this case because Clajon asserted its declaratory-judgment counterclaim in the same proceeding. 
We disagree for the reasons set forth in In re Estate of Kidd, 812 S.W.2d 356, 359-60 (Tex.
App.--Amarillo 1991, writ denied). Texas courts apply the rule regardless whether the claim for
declaratory relief occurs in the same proceeding or in a separate proceeding. See, e.g., Hitchcock
Properties, Inc. v. Levering, 776 S.W.2d 236, 239 (Tex. App.--Houston [1st Dist.] 1989, writ
denied); Heritage Life v. Heritage Group Holding, 751 S.W.2d 229, 235 (Tex. App.--Dallas 1988,
writ denied); see also Texstar N. Am., Inc. v. Ladd Petroleum Corp., 809 S.W.2d 672, 679 (Tex.
App.--Corpus Christi 1991, writ denied).

 We hold that the award of attorney's fees under the Uniform Declaratory Judgment
Act was unauthorized. See Hitchcock Properties, 776 S.W.2d at 239; Heritage Life, 751 S.W.2d
at 235. We sustain HECI's twelfth point of error. Therefore, we need not address its thirteenth
and fourteenth points of error.

 Finding reversible error in the trial-court judgment, we reverse the judgment and
remand the cause to the trial court.




 

 John Powers, Justice

[Before Justices Powers, Jones and Kidd; Justice Kidd not participating]

Reversed and Remanded

Filed: October 7, 1992

[Publish]

1.   We will refer to the three appellees collectively as "Clajon," except when a
distinction between the appellees is necessary.
2.   The parties negotiated for another contract in 1985. We will refer to the latter
contract as the "1985 Contract." We will refer to the 1982 contract simply as the
"Contract" unless the designation would cause confusion, in which case we will refer to it
as the "1982 Contract."
3.   The order actually adjudged that HECI take nothing and that the suit be dismissed
with prejudice. These are, of course, mutually exclusive. We construe the order as a
judgment on the merits of the pipeline claim.
4.   Despite the alleged conflicts, HECI has continued to employ Olson as a bankruptcy
attorney throughout the course of the present litigation.

5.   Texas Disciplinary Rule of Professional Conduct 1.09 provides that "[w]ithout prior
consent, a lawyer who personally has formerly represented a client in a matter shall not
thereafter represent another person in a matter adverse to the former client: (1) if it is
the same or a substantially related matter . . . ." Tex. Disciplinary R. Prof. Conduct
1.09(a) (State Bar Rules art. X, § 9). Rule 1.09(b) disqualifies all the members of a
lawyer's firm if the lawyer practicing alone would be disqualified by Rule 1.09(a). Id.
Rule 1.09(b); see also id. Rules 1.05(b), 1.06 (setting forth general conflict-of-interest rules).


 HECI filed in 1989 its motion to disqualify counsel, but a hearing on the motion was
not held until February 1990. Thus, the superseded Texas Code of Professional Responsibility
arguably governs the standards of conduct expected of Olson and G, C & M. See State Bar
Rules art. X, § 8, Tex. Code Prof. Responsibility, Canon 4, 46 Tex. B.J. 1138a (1984,
repealed 1989); State Bar of Tex., Ethical Considerations on Code of Professional
Responsibility, EC 4-1 to 4-6 (1972, repealed 1989); Tex. Code of Prof. Responsibility, DR
4-101 (1984, repealed 1989). We need not decide which set of rules governs because our
decision is the same under either set.
6.   The trial court's conclusion is further supported by Donald Godwin's affidavit
testimony that Youngblood and HECI offered to abandon the issue of disqualification of
G, C & M if Clajon would agree to forego all defenses and claims concerning the 1985
Contract.
7.   We wish to emphasize that our ruling applies only to G, C & M. The
disqualification is certainly applicable as to Olson. See Enstar Petroleum, 773 S.W.2d at
664.
8.   The Railroad Commission fixes a monthly allowable of gas to be produced from
each reservoir, and then allocates the monthly allowable among all wells entitled to
produce gas from the reservoir. Tex. Nat. Res. Code Ann. §§ 86.086, 86.087 (1978). To
arrive at a particular well's daily allowable, the Commission divides the monthly
allowable by the number of days in the month. Tex. Nat. Res. Code Ann. § 86.088.
9. [9]  The Railroad Commission's six-month balancing periods are from March 1 to August
31 and from September 1 to February 28. Because the Contract expired on December 31, the
contractual period did not correspond with a balancing period.
10.   An illustration may clarify the point. Assuming each well had daily allowables of
100 Mcf, Clajon was obligated to take 80 Mcf per day if the daily allowables were a
ceiling on HECI's obligation to take or pay for gas. As stated above, however, the daily
allowables do not provide an absolute limit on daily production. Therefore, if a well
produced 120 Mcf per day, Clajon was obligated to take or pay for 96 Mcf per day. 
Clajon made no effort to show HECI's production never exceeded 100 Mcf per day or
that the average production of each well over the life of the Contract did not exceed 100
Mcf. In fact, Clajon has not even shown that it took 80 Mcf per day.
11.   Article V, Paragraph 12 provided:


12. Nothing in this Contract shall be construed to require Seller to deliver
or Buyer to purchase and receive from Seller or pay Seller for any
quantities of Gas in excess of that which may be produced under the
applicable rules, regulations and orders of regulatory bodies having
jurisdiction.
12.   We note that Clajon errs in its reliance on Luling Oil & Gas Co. v. Humble Oil &
Refining Co., 191 S.W.2d 716 (Tex. 1945). The contractual provision in Luling Oil imposed
a thirty-day deadline for Humble to present Luling Oil with a list of expenses incurred. Id. at
719. The Contract contains no such deadline. Thus, Luling Oil is distinguishable from the
case at bar.
13.   The Contract defined "Accounting Period" as the twelve-month period following the
initial delivery of gas; each succeeding twelve-month period constituted a new accounting
period. The wells dedicated to the Contract had different accounting periods. Two of the
wells had initial delivery dates in 1982, meaning their first accounting period ended in
1983 and their second accounting period ended in 1984. The initial delivery date of the
other three wells was in early 1983, meaning their first accounting periods ended in early
1984. HECI did not make a demand for deficient takes for the first accounting period
until December 14, 1984. Therefore, for some wells the second accounting period had
ended before HECI requested payment for deficient takes from the first accounting
periods.
14.   We note that Clajon made this very point in its motion for summary judgment: It
argued that if it was liable for deficient takes, it had a right either to recover prepaid gas
for a year following the Contract term or to receive a cash refund because HECI's supply
was no longer available due to HECI's other delivery contracts. In the pleadings on
which the trial court rendered summary judgment, Clajon also asserted a counterclaim
requesting that it be allowed an offset for any sums found owing to HECI.


 In any event, we do not mean to imply Clajon could not have exercised its make-up
rights. Although we do not so hold, we doubt HECI could wait until the end of the
contractual term to demand performance and then disclaim, on the ground that the term had
expired, its own obligation to perform the Contract.
15.   One source defines "wellhead pressure" as the "pressure at the casinghead or
wellhead when all valves are closed and no oil or gas has been allowed to escape for a
period of time, usually more than 24 and less than 72 hours." Howard R. Williams &
Charles J. Meyers, Manual of Oil & Gas Terms 1150 (1991) (under the cross-referenced
heading "shut-in pressure"). It is not immediately clear how gas can have a wellhead pressure
at the point of delivery, which the Contract defined as "the inlet of Buyer's metering facilities
to be located at each well near the outlet of Seller's separation or processing equipment."
16.   Although we have no desire to rewrite the Contract to delete terms supplied by the
parties, we note that this expressed intent reveals a basic inconsistency in Clajon's
argument on appeal: If Clajon and HECI intended by the Contract "to allow for the
purchase and delivery of lower pressure gas if such gas was available," Clajon has no
principled basis to complain; regardless of the wellhead pressure, HECI made low-pressure
gas available to Clajon at the point of delivery. Nevertheless, we base our holding on Clajon's
failure to prove its entitlement to summary judgment, not on its failure to show harm.
17.   See Uniform Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code Ann.
§§ 37.001-.011 (1986 & Supp. 1992). In any proceeding under the Uniform Declaratory
Judgments Act, "the court may award costs and reasonable and necessary attorney's fees as are
equitable and just." Id. § 37.009.