NUMBER 13-09-00192-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG
                                                                                                                       

ROBERT V. BUCK AND QUEEN ISABELLA
DEVELOPMENT JOINT VENTURE,                                           Appellants,

v.

G.J. PALMER JR.,                                                                         Appellee.
                                                                                                                                      

On appeal from the 370th District Court
of Hidalgo County, Texas.
                                                                                                                      

MEMORANDUM OPINION
 
Before Chief Justice Valdez and Justices Benavides and Vela
Memorandum Opinion by Justice Benavides
          Appellants, Robert V. Buck (“Buck”) and Queen Isabella Development Joint Venture
(“Queen Isabella”), appeal the trial court’s final summary judgment and two other orders
rendered in favor of appellee, G.J. Palmer Jr. (“Palmer”). By five issues, Buck and Queen
Isabella argue that the trial court erred by: (1) granting summary judgment that Queen
Isabella was dissolved and that the value of Buck’s interest on dissolution was zero; (2)
granting summary judgment on limitations; (3) refusing to require Palmer to produce
personal financial statements; (4) denying Buck and Queen Isabella’s motion to disqualify
Palmer’s counsel; and (5) granting affirmative declaratory relief to Palmer. We affirm.



I. Background
A.       The Creation and Demise of Queen Isabella Development Joint Venture
          On April 27, 1984, Buck, Palmer, John Thobe, and 1629 Service Corporation
(“1629") entered into a joint venture agreement (the “partnership agreement”) for the
development of property in Port Isabel, Texas. The joint venture was named Queen
Isabella Development Joint Venture, and the parties intended to purchase and develop
property in Port Isabel to construct Queen’s Point Marina and Yacht Club. Ownership of
the joint venture was initially distributed as follows: Buck, Palmer, and Thobe each owned
twenty percent, and 1629 owned forty percent. 
          Queen Isabella borrowed over $7 million for the marina from 1629's parent
company, Peoples Savings and Loan (“Peoples”), and Palmer and Buck signed guaranties
on the promissory notes. Palmer and Buck also borrowed $200,000 from 1629 to fund
joint venture expenses. Construction began on the marina, and it opened for business. 
In 1986, Thobe’s interest was transferred to 1629. Furthermore, in 1986, the marina was
hit by three major storms, causing severe damage. 
          Peoples eventually stopped funding the joint venture and demanded payment of its
promissory note. In 1988, the Federal Home Loan Bank Board determined that Peoples
was insolvent and appointed the Federal Savings and Loan Insurance Corporation as its
receiver. The receiver transferred Peoples’s assets to Texas Trust Savings Bank (“Texas
Trust”), and later, CTX Holding Company (“CTX”) succeeded to the interests of Texas
Trust. 
          Palmer and Buck defaulted on their personal note from 1629, and Queen Isabella
defaulted on the mortgage. In 1988, Thobe sued Palmer, Buck, and Peoples in Hidalgo
County. Queen Isabella’s creditors also attempted to foreclose on their note secured by
the marina’s property. Palmer and Buck engaged attorney Ramon Garcia to initiate
lawsuits in Hidalgo County against Queen Isabella’s lenders and against design
professionals and contractors who had constructed the marina. Buck and Palmer,
individually and on behalf of Queen Isabella, added these claims as a third-party action in
Thobe’s lawsuit against them. Eventually, Thobe’s lawsuit was severed into three separate
actions. Additionally, lawsuits were filed in Llano County by Texas Trust against Queen
Isabella, Palmer, and Buck on the mortgage and by 1629 against Palmer and Buck on their
personal loan (the “Llano County litigation”). Attorney John Griffith represented Palmer and
Buck in the Llano County litigation. 
          In 1992, in the Llano County litigation, Texas Trust obtained a judgment against
Queen Isabella for $14,865,977.80 and against Buck and Palmer individually for forty
percent of that amount, or $5,946,391.12, under the terms of their guaranty. The judgment
states that Texas Trust had the right to foreclose its lien against Queen Isabella’s property. 
1629 also obtained a personal judgment against Buck and Palmer in 1994. The Llano
County litigation was ultimately settled after trial on September 29, 2005, and the
negotiation of this settlement is the basis for the current dispute.
B.       The Dispute Below
          The current lawsuit began on April 19, 1996, as a suit by Garcia against Palmer for
legal fees. Buck was added as a defendant on June 13, 1997. Then, on July 22, 1997,
Palmer filed a cross-claim against Buck. Palmer asserted that on various dates in 1993,
he and Buck met to discuss the pending litigation, and Buck promised that if Palmer could
arrange for a complete release of liability for Buck from the joint venture’s indebtedness,
Buck would transfer his interest in Queen Isabella to Palmer. Palmer alleged that Buck
was not willing to assume any new liabilities and wanted to dissolve Queen Isabella as
early as 1993, but at the very least by 1995, Buck made it clear that he had no desire to
continue the joint venture. Palmer claimed that he thereafter negotiated a settlement of
the Llano County litigation, which included a complete release of Buck’s liability on Queen
Isabella’s indebtedness. The settlement agreement also provided for a transfer of 1629's
interest in Queen Isabella to Palmer. 
          Palmer alleged that after the settlement agreement was negotiated with Queen
Isabella’s creditors, Buck refused to transfer his interest in Queen Isabella. Thus, Palmer
sued Buck for breach of an oral agreement to transfer Buck’s interest, requested specific
performance, and requested a declaration that “Buck is equitably required to transfer the
twenty percent interest in [Queen Isabella] which Buck alleges he still owns to Palmer . . . .” 
Palmer also sought a declaratory judgment, asking the court to declare the “interest of the
said Palmer and Buck in Queen Isabella Development Joint Venture and in relation to the
obligation, if any, for attorneys’ fees alleged by Plaintiffs and Counter Defendants, Ramon
Garcia and Ramon Garcia, P.C.”
          Buck denied the existence of the oral contract, asserted several defenses to
enforcement of the alleged contract, and also asserted cross-claims against Palmer. Buck
claimed that to induce him into settling the Llano County litigation, Palmer represented that
he would be responsible for executing a $600,000 promissory note secured by Queen
Isabella’s property in favor of CTX. Buck alleged that this representation was false, and
instead of executing the promissory note individually, Palmer caused Queen Isabella to pay
the note. As a result of this deceit, Buck alleged that Palmer acquired 1629's interest in
Queen Isabella, making him the owner of eighty percent of Queen Isabella. Buck asserted
that the joint venture continued to do business after settling the Llano County litigation in
1995, and in 1998, Palmer caused Queen Isabella to execute a promissory note payable
to himself secured by all of Queen Isabella’s real property. Palmer then assigned the note
and collateral to Texas State Bank (“TSB”) to collateralize his own promissory note in the
amount of $780,000. Finally, Palmer caused Queen Isabella to sell a portion of the Port
Isabel property to Port Isabel Land Company, Ltd. (“PILCO”), which was partly owned by
Palmer. Thus, Buck claimed that Palmer had engaged in self-dealing with Queen
Isabella’s property. 
          Buck sought a declaration that he was still the owner of an interest in Queen
Isabella and expressly requested the court to “determine the fair value of the interest in
[Queen Isabella] owned by him.” Buck also sought rescission of the agreement to transfer
1629's interest in Queen Isabella to Palmer and the transfer of Queen Isabella’s property
to PILCO in 1998. Buck asserted that Palmer: (1) committed constructive fraud and
common law fraud; (2) breached the partnership agreement; (3) breached his fiduciary
duties to Queen Isabella and to Buck; (4) committed securities fraud; and (5) conspired
with Garcia, Griffith, and his other attorney, Samuel McDaniel, to cause Garcia to sue Buck
for attorney fees. Buck requested injunctive relief, a receivership, an accounting, a
constructive trust, disgorgement of profits, and winding up of the partnership. The trial
court severed Garcia’s claims for attorney fees from Buck and Palmer’s cross-claims, and
the cross-claims proceeded as trial court cause number C-2058-96-G(1). 
C.       Buck Seeks Production of Palmer’s Financial Statements
          Buck deposed a TSB representative regarding transactions between Queen Isabella
and Palmer, attempting to prove that Palmer used Queen Isabella’s property to benefit
himself in violation of duties Palmer owed to Queen Isabella and to Buck. Buck obtained
a supboena and requested that TSB produce “loan documents” relating to Queen Isabella,
which included financial statements. 
          At the deposition pursuant to the subpoena, TSB produced Palmer’s personal
financial statements. Palmer’s counsel objected that the financial statements were
confidential. The parties agreed to allow the court reporter to copy the documents and to
submit them to the court under seal. On January 27, 2005, Buck filed a motion to overrule
Palmer’s objections to the production of his financial statements, and the trial court heard
the motion on March 7, 2006. The court stated on the record that it would review the
documents. Buck reminded the court of his request at various hearings throughout 2008,
but the trial court kept the matter under advisement. 
D.       Buck Seeks to Disqualify Palmer’s Counsel
          On January 28, 2008, attorney Sarah Pierce Cowen filed a notice of appearance in
the case on Palmer’s behalf. On July 28, 2008, Buck moved to disqualify Cowen, alleging
that Cowen was associated with Griffith’s firm, Griffith & Garza, because she was at one
time “of counsel” to that firm and had signed her name on pleadings filed by that firm in
other cases. Because Griffith represented both Buck and Palmer in the Llano County
litigation, Buck asserted that Cowen’s association with Griffith’s firm precluded her from
representing Palmer. The trial court held a hearing on the motion to disqualify on August
19, 2008, and took the matter under advisement. 
E.       Palmer Moves for Summary Judgment on Dissolution of Queen Isabella
          On September 15, 2008, Palmer filed two separate motions for summary judgment. 
The first motion was titled “Palmer’s No Evidence and Traditional Motions for Summary
Judgment Based on Dissolution as to All Causes of Action by Robert V. Buck and Queen
Isabella Development Joint Venture.” In this motion, under separate headings, Palmer
moved for summary judgment under the no-evidence standard and under the traditional
summary judgment standard. The no-evidence argument stated the no-evidence standard
and then argued: “In this case there is no evidence that buck [sic] had an interest in the
partnership after dissolution. Consequently, Buck is not entitled to prevail on any of his
claims.” The next heading contained the traditional summary judgment standard and
argued: 
In this [sic] present case there is no genuine dispute that dissolution occurred
of the Queen Isabella Development Joint Venture some time prior to the
filing date of this lawsuit. Therefore, Buck’s remedy was to receive the value
of his interest in the partnership when it was dissolved. It is also undisputed
that[,] because of the massive debt[,] his value was no more than zero
dollars.

          Under another heading titled “Facts and Argument,” Palmer set forth the factual
background for the motion and the applicable law. Palmer argued that the Texas Uniform
Partnership Act (“TUPA”) applied to the joint venture. See Act of May 9, 1961, 57th Leg.,
R.S., ch. 158, 1961 Tex. Gen. Laws 289, expired January 1, 1999, Act of May 31, 1993,
73rd Leg., R.S., ch. 917, 1993 Tex. Gen. Laws 3887 (formerly Tex. Rev. Civ. Stat. Ann.
art. 6132b).


 Palmer asserted that on various dates in 1993, 1995, and 1996, Buck
expressed a desire to dissolve the partnership, which caused a dissolution of the
partnership. Palmer argued that under TUPA, the remaining partners may elect to
continue with the partnership business, but the powers and duties from the relationship
terminate except for those necessary to complete a winding up of the partnership. Thus,
once Buck expressed his will to dissolve the partnership, Palmer owed him no further
duties except with respect to winding up the partnership’s existing obligations. Palmer
argued that Buck was entitled to the fair value of his interest at the date of dissolution,
which, because of the amount of debt owed by the partnership, was zero. For these
reasons, Palmer argued that there were no causes of action that Buck could assert against
Palmer for his actions after dissolution of the partnership. Palmer’s motion referred to a
separately filed appendix containing evidence supporting the motion.
          Buck filed a response to the motion. He argued that he did not cause a dissolution,
but even if he did, the partnership continued for the purpose of winding up. Thus, he
claimed that Palmer’s fiduciary duty was continuing. He argued that to wind up the
partnership, the partnership business must be liquidated, and if a surplus remains after the
discharge of partnership liabilities, it must be distributed to the partners in accordance with
their capital accounts and profit sharing ratios. Thus, the partners share in the risks and
rewards of the post-dissolution appreciation or depreciation of the partnership’s assets. 
Buck then argued that he was entitled to elect whether to liquidate the partnership or to
have his interest valued at the date of dissolution, and he did not elect to have his interest
valued at the date of dissolution. 
          Buck attached evidence supporting his response. Buck also filed objections and
moved to strike Palmer’s summary judgment evidence. These objections went to the
admissibility of Palmer’s summary judgment evidence and not to the form or content of the
motion itself. 
F.       Palmer Moves for Summary Judgment on Limitations
          Palmer’s second motion for summary judgment was titled “Palmer’s No Evidence
and Traditional Motions for Summary Judgment as to All Causes of Action by Robert V.
Buck and Queen Isabella Development Joint Venture.” As with the first motion, Palmer set
out the no-evidence and traditional standards for summary judgment under separate
headings. Palmer argued that Buck bore the burden to show that he asserted his claims
in court after the partnership ceased doing the business intended within the applicable
statute of limitations. Palmer then argued that Buck’s claims were barred under the various
limitations periods applicable to the claims, arguing that Buck’s claims accrued in 1987,
when the partnership ceased doing business. Palmer filed a separate appendix containing
evidence supporting the motion.
          Buck responded and disputed that limitations barred his claims and provided
evidence supporting the response. Buck further objected to Palmer’s summary judgment
evidence, but he did not object to the form of the motion. 
G.       The Trial Court Issues Its Rulings
          On January 7, 2009, the trial court ruled on all the motions that are the subject of
the current appeal. It denied Buck’s motion to overrule Palmer’s objections to the
production of his financial statements and sustained Palmer’s objections.  It also denied
Buck’s motion to disqualify Cowen. Neither of these orders stated a basis for the trial
court’s ruling. 
          The same day, the trial court granted Palmer’s motions for summary judgment and
denied all of Buck’s objections to Palmer’s summary judgment evidence. This order,
however, stated the following:
The court GRANTS the following Palmer Motions for Summary
Judgment on both No Evidence grounds and Traditional grounds:
 
1.Palmer’s No Evidence and Traditional Motions for Summary
Judgment Based on Dissolution as to All Causes of Action by Robert
V. Buck and Queen Isabella Development Joint Venture; and
 
2.Palmer’s No Evidence and Traditional Motions for Summary
Judgment Based on the Statute of Limitations as to All Causes of
Action by Robert V. Buck and Queen Isabella Development Joint
Venture.
 
The Court hereby GRANTS Judgment for G.J. Palmer, Jr.
 
Further the Court grants judgment that G.J. Palmer, Jr. is the sole
owner of Queen Isabella Development Joint Venture and all properties held
in its name whether real or personal. . . . 
 
The Court finds that Queen Isabella Development Joint Venture was
dissolved, at the latest, in June 1995, that the value of Robert V. Buck’s
interest in the venture at dissolution was zero, that G.J. Palmer, Jr. was
entitled to carry on the business of the venture after dissolution, and that
Buck’s claims are barred by the Statute of Limitations.
 
The Court orders Robert V. Buck and Queen Isabella Development
Joint Venture take nothing by their suit against Palmer, and that Palmer
recover costs of court. 
This appeal ensued.
II. Motion to Disqualify
          By their fourth issue, Buck and Queen Isabella argue that the trial court erred by
denying their motion to disqualify Cowen. Buck and Queen Isabella assert that Griffith,
who represented both Buck and Palmer in the Llano County litigation, had a conflict of
interest once Buck and Palmer disputed the terms of the 1995 settlement agreement. 
Because Cowen was “associated” with Griffith’s firm, Buck and Queen Isabella reason that
Cowen also has a conflict of interest under rule 1.09(b) of the Texas Disciplinary Rules of
Professional Conduct. See Tex. Disciplinary R. Prof’l Conduct 1.09(b), reprinted in Tex.
Gov’t Code Ann., tit. 2, subtit. G app. A (Vernon Supp. 2008) (Tex. State Bar R. art. X,
§ 9). Buck and Queen Isabella argue that the judgment must be reversed and remanded
because Cowen’s participation in the summary-judgment proceedings tainted them beyond
repair. Palmer claims that Buck and Queen Isabella waived this argument by waiting too
long to file the motion to disqualify. We agree with Palmer.
A.       Standard of Review and Applicable Law
          The denial of a motion to disqualify is reviewed for an abuse of discretion. See
Metro. Life Ins. Co. v. Syntek Fin. Corp., 881 S.W.2d 319, 321 (Tex. 1994) (per curiam). 
“The test for abuse of discretion is whether the trial court acted without reference to any
guiding rules or principles, or acted in an arbitrary or unreasonable manner.” Id. Trial
courts have no discretion in determining what the law is or applying the law to the facts. 
WCM Group, Inc. v. Brown, 305 S.W.3d 222, 229 (Tex. App.–Corpus Christi 2009, pet.
dism’d by agr.). “A trial court does not abuse its discretion when it bases a decision on
conflicting evidence—rather, a factual decision is an abuse of discretion only if there is no
evidence to support the decision.” Id. In this regard, we may not substitute our own
judgment for the trial court’s judgment. In re Nitla S.A. de C.V., 92 S.W.3d 419, 422 (Tex.
2002) (orig. proceeding) (per curiam). Likewise, we will not set aside the trial court’s
finding “unless it is clear from the record that the trial court could only reach one decision.” 
Id. When the trial court does not issue findings of fact in conjunction with a ruling on a
motion to disqualify, we imply all findings necessary to support the ruling. See In re Hoar
Const., L.L.C. 256 S.W.3d 790, 795 (Tex. App.–Houston [14th Dist.] 2008, orig.
proceeding) (reviewing an implied finding that a party did not waive a motion to disqualify
opposing counsel).
           “‘Disqualification is a severe remedy.’” Id. (quoting Spears v. Fourth Court of
Appeals, 797 S.W.2d 654, 656 (Tex. 1990) (orig. proceeding)). When deciding a motion
to disqualify, trial courts must “strictly adhere to an exacting standard to discourage a party
from using the motion as a dilatory tactic” because disqualification of counsel “can result
in immediate and palpable harm, disrupt trial court proceedings, and deprive a party of the
right to have counsel of choice.” Id. 
          It is well established that a party can waive its motion to disqualify opposing counsel
by failing to timely file the motion. See Turner v. Turner, 385 S.W.2d 230, 236 (Tex. 1965);
see also In re EPIC Holdings, Inc., 985 S.W.2d 41, 52 (Tex. 1998); Vaughan v. Walther,
875 S.W.2d 690, 690 (Tex. 1994) (orig. proceeding) (per curiam). “In determining whether
a party has waived the complaint, the court will consider the length of time between when
the conflict became apparent to the aggrieved party and when the aggrieved party filed the
motion to disqualify.” In re Butler, 987 S.W.2d 221, 224-25 (Tex. App.–Houston [14th Dist.]
1999, orig. proceeding). We must also consider any evidence that indicates the motion is
being filed not due to a concern arising from the conflict of interest alleged but as a dilatory
trial tactic. See Wasserman v. Black, 910 S.W.2d 564, 568 (Tex. App.–Waco 1995, orig.
proceeding) (citing Spears, 797 S.W.2d at 656)).  
B.       Date the Conflict Became Apparent
          The parties dispute when Cowen’s conflict became apparent. Cowen filed her
notice of appearance in this case on January 28, 2008, signing it as “The Law Offices of
Sarah Pierce Cowen.” Buck argues that his lead counsel, Charles Gorham, did not
become aware that Cowen was associated with Griffith’s law firm until June 2008, when
the relationship between Cowen and Griffith was disclosed in open court. Buck then filed
its motion to disqualify Cowen on July 28, 2008. Buck argues that, therefore, his motion
to disqualify was timely.
          Palmer responds that Gorham’s co-counsel in this case, Francisco Rodriguez, was
aware that Cowen was participating in the case in January 2008 and was, at that time,
aware of Cowen’s relationship with Griffith’s firm.


 It is undisputed that in January 2008,
Rodriguez was co-counsel with Gorham representing Buck in this litigation. The notice of
appearance was admitted as an exhibit at the hearing on the motion to disqualify, and it
states that it was served on Rodriguez on January 24, 2008. 
          Gorham questioned Cowen about his own knowledge of the conflict and told the
court that he would put on testimony that no one on Buck’s behalf knew of the association
between Cowen and Griffith until June 2008. The following exchange occurred: 
[Buck’s Lead Counsel]:How would you expect me, as a lawyer, to know
you were associated with the Griffith & Garza
law firm in other matters?
 
[Cowen]:Because your co-counsel is Frank Rodriguez,
and I have known him for years and litigated
against him for years, and he is familiar with my
personal situation.
 
[Buck’s Lead Counsel]:And so what you are telling me is that Mr.
Rodriguez as local counsel, knew of your
involvement, and so you are attributing that to
Mr. Buck?
 
[Cowen]:That’s the first thing that comes to mind. I don’t
know how you would learn it, but I know Mr.
Rodriguez is familiar with that. 

No other evidence was presented on Rodriguez’s knowledge of Cowen’s association with
Griffith.
          Buck argues that this evidence is insufficient because it does not delineate what
Rodriguez supposedly knew or the time frame of his knowledge; thus, there is no
knowledge to impute to Buck. Additionally, citing In re EPIC Holdings, Buck argues that
even though Rodriguez knew of the connection, he did not communicate it to Gorham;
therefore, waiver should not be based on this information. 985 S.W.2d at 52. We
disagree. 
          First, Cowen’s testimony that Rodriguez knew her and litigated against her “for
years” and was aware of her situation is some evidence that Rodriguez knew that Cowen
had been associated with Griffith’s firm. Furthermore, the questioning, in context, shows
that Cowen meant that Rodriguez knew about the facts giving rise to the alleged conflict
when Cowen appeared in the lawsuit—she expressly stated that she believed the
knowledge should be imputed to Buck and to Gorman prior to the June 2008 hearing,
where Gorman claimed to have first learned of the conflict. Because the trial court did not
issue any findings of fact, we presume that the trial court determined that Rodriguez knew
about Cowen’s association with Griffith in January 2008, and because this finding was
supported by evidence in the record, it was not an abuse of discretion. See WCM Group,
Inc., 305 S.W.3d at 229; In re Hoar Const., L.L.C. 256 S.W.3d at 795. 
          Second, an attorney’s knowledge or notice that is acquired during the existence of
the attorney-client relationship is imputed to the client. See Am. Flood Research Ins. v.
Jones, 192 S.W.3d 581, 584 (Tex. 2006) (per curiam); Lehrer v. Zwerneman, 14 S.W.3d
775, 778 (Tex. App.–Houston [1st Dist.] 2000, pet. denied). In re EPIC Holdings does not
render this rule inapplicable in this case. In that case, Anderson sued EPIC Holdings and
its chief executive officer, George, for breaching fiduciary duties to EPIC Holdings’s
shareholders by exorbitantly compensating executives in connection with the acquisition
of EPIC Holdings by HealthTrust, Inc.—The Hospital Company. In re EPIC Holdings, Inc.,
192 S.W.3d at 43-44. The law firm of Johnson & Gibbs represented George and EPIC
Holdings in the acquisition and negotiation of executive compensation. Id. at 45-46. 
          One of the Johnson & Gibbs lawyers who worked on the merger, Jakes Jordaan,
left Johnson & Gibbs to form the firm of Jordaan, Howard & Pennington. Id. at 45. When
Anderson filed suit against George and EPIC Holdings, she was represented by James E.
Pennington, a member of Jordaan’s firm. Id. at 46. George and EPIC Holdings, however,
were represented by Jerry R. Selinger, who was unaware of the connection. Id. at 46. The
Texas Supreme Court determined that Pennington was disqualified and that George and
EPIC Holdings did not waive their motion to disqualify, noting that:
Anderson argues that EPIC and George waived disqualification of her
counsel by waiting over four months after suit was filed to raise the issue and
seven more months to file their motions. We think EPIC and George have
satisfactorily explained these delays. For four months after Anderson filed
suit defendants’ counsel was unaware of the connection between attorney
Pennington’s firm and Johnson & Gibbs. Johnson & Gibbs, who was
representing EPIC in the HealthTrust merger, recognized the connection but
did not communicate it to defendants’ litigation counsel. 

Id. at 52.
          In re EPIC Holdings is distinguishable because the party’s attorney who had
knowledge of the conflict was not representing the party in the litigation where
disqualification was asserted. Id. That is not the case here: Rodriguez was Gorham’s co-counsel representing Buck in this lawsuit at the time that Cowen appeared on behalf of
Buck’s opponent. Thus, Rodriguez’s failure to communicate the conflict to Buck’s lead
counsel, Gorham, does not excuse the delay in filing the motion to disqualify. 
C.       Length of Delay and Prejudice to Palmer
          Because we hold that Buck acquired knowledge of the conflict in January 2008, the
delay in filing the motion amounts to nearly seven months. Aside from his argument that
Gorham was unaware of the conflict, Buck has offered no other explanation to justify the
seven-month delay in filing the motion to disqualify. The Texas Supreme Court has held
that an unexplained delay of six and a half months before filing a motion to disqualify
waives the motion. See Vaughan, 875 S.W.2d at 691. The delay in this case was even
longer. See id.
          Nevertheless, Buck argues that Palmer was required to present evidence that he
was prejudiced by the delay and points out that the motion was not filed on the eve of trial,
again citing In re EPIC Holdings. See 985 S.W.2d at 53. The Texas Supreme Court has
never held that proof of prejudice is required to sustain a claim of waiver under these
circumstances, see Spears, 797 S.W.2d at 656 n.1, and In re EPIC Holdings does not
state as much. See 985 S.W.2d at 53. Rather, in that case, after finding that EPIC
Holdings and George sufficiently explained their delay in filing the motion to disqualify, the
court simply noted that Anderson had not suffered any prejudice as a result of the delay. 
See id. (“It is of some importance that in the eleven months before the motions to disqualify
were filed almost no discovery was conducted except on disqualification issues. The delay
in filing the motions did not prejudice Anderson’s prosecution of her claims.”). 
          We read In re EPIC Holdings as following the traditionally-accepted rationale that
reviewing courts must apply an exacting standard when reviewing motions to disqualify,
which are disfavored, and evidence that a party is using the motion as a dilatory tactic is
merely relevant to the determination of waiver. Grant v. Thirteenth Court of Appeals, 888
S.W.2d 466, 468 (Tex. 1994) (“The untimely urging of a disqualification motion lends
support to any suspicion that the motion is being used as a tactical weapon.”). In fact, in
cases involving a lengthy delay, such as the one here, courts have refused a motion to
disqualify without discussing whether trial was impending. See HECI Exploration Co. v.
Clajon Gas Co., 843 S.W.2d 622, 628-29 (Tex. App.–Austin 1992, writ denied); Conoco
Inc. v. Baskin, 803 S.W.2d 416, 420 (Tex. App.–El Paso 1991, orig. proceeding) (noting
that an eleven-month delay, without regard to a trial setting, was enough to find waiver, and
then recognizing that a four-month delay would also support a waiver because although
it was shorter, it was more significant in the context of the close trial date).
          Regardless, even if we applied In re EPIC Holdings the way Buck proposes, we
would still find waiver. There, the Texas Supreme Court noted that no activity, other than
discovery related to disqualification, had occurred during the delay, and therefore,
Anderson was not prejudiced. See 985 S.W.2d at 53. That is not the case here. Cowen
appeared in January 2008, and the record reflects that there was substantial activity in the
case on the merits between the time that Cowen appeared as Palmer’s counsel and the
time the motion to disqualify was filed. 
          For example, the docket sheet shows that the case was set for trial in April 2008 and
that the parties were preparing for trial.


 Palmer moved to exclude Buck’s experts at the
end of March 2008, and Buck filed his trial exhibits, his list of trial witnesses, and a motion
in limine on April 1, 2008. The April trial date was passed, but not without the parties
having prepared for trial. Additionally, the docket sheet shows that Palmer filed a motion
for no-evidence and traditional summary judgment


 on March 19, 2008 and that this motion
was heard on April 10, 2008. Furthermore, Palmer had filed special exceptions, and these
were heard on June 10, 2008. Cowen appeared on Palmer’s behalf at this hearing. Thus,
even if we were required to examine the proceedings between Cowen’s appearance and
the filing of the motion to disqualify, we could not say that Palmer was not prejudiced. 
Accordingly, we hold that the trial court did not abuse its discretion in refusing to disqualify
Cowen as Palmer’s attorney, and we overrule Buck’s fourth issue.
III. Summary Judgment
          By their first issue, Buck and Queen Isabella argue that the trial court erred by
granting Palmer’s no-evidence and traditional motions for summary judgment on
dissolution. They argue that Palmer’s motion was based on a defensive
issue—dissolution—and relied on evidence Palmer attached to the motion, which
converted it into a traditional motion for summary judgment. Furthermore, Buck and
Queen Isabella argued that Palmer failed to conclusively establish dissolution on the dates
alleged and that the value of Buck’s interest was zero. Finally, they argue that to the extent
the burden shifted to them, they presented evidence to defeat the motion. For the reasons
that follow, we disagree.



A.       Standards of Review
          The trial court granted both of Palmer’s motions for summary judgment. Buck
argues that the trial court made factual findings in the judgment, including that: (1) Queen
Isabella was dissolved at the latest in June 1995; (2) Buck’s interest at the date of
dissolution was zero; (3) Palmer was entitled to carry on the business of the venture; and
(4) Buck’s claims were barred by limitations. Buck argues that these factual findings are
inappropriate because, as a matter of form, findings and conclusions should not be
contained in the judgment itself. We agree. Thus, we do not consider the factual findings
set out in the judgment. See Tex. R. Civ. P. 299a; IKB Indus. v. Pro-Line Corp., 938
S.W.2d 440, 441 (Tex. 1997) (“The trial court should not make, and an appellate court
cannot consider, findings of fact in connection with a summary judgment.”).


 
          We review the grant of summary judgment as we would a summary judgment that
failed to state the grounds for its rulings. Under these circumstances, we must affirm the
judgment if any of the grounds alleged in the motions were meritorious. W. Invs., Inc. v.
Urena, 162 S.W.3d 547, 550 (Tex. 2005). The standard of review we apply is determined
by whether the motion was brought on no-evidence or traditional grounds. See Tex. R. Civ.
P. 166a(c), (i); see also Ortega v. City Nat’l Bank, 97 S.W.3d 765, 771 (Tex. App.–Corpus
Christi 2003, no pet.) (op. on reh’g). 
          A no-evidence summary judgment is equivalent to a pretrial directed verdict, and we
apply the same legal sufficiency standard on review. Mack Trucks, Inc. v. Tamez, 206
S.W.3d 572, 582 (Tex. 2006); Ortega, 97 S.W.3d at 772. Once an appropriate motion for
no-evidence summary judgment is filed, the burden of producing evidence is entirely on
the non-movant; the movant has no burden to attach any evidence to the motion. Tex. R.
Civ. P. 166a(i). We may not consider any evidence presented by the movant unless it
creates a fact question. Binur v. Jacobo, 135 S.W.3d 646, 651 (Tex. 2004); Newkumet
v. Allen, 230 S.W.3d 518, 521 (Tex. App.–Eastland 2007, no pet.).
          To defeat a no-evidence motion for summary judgment, the non-movant must
merely produce a scintilla of probative evidence to raise a genuine issue of material fact.
Ortega, 97 S.W.3d at 772. “Less than a scintilla of evidence exists when the evidence is
‘so weak as to do no more than create a mere surmise or suspicion of a fact.’” Id. (quoting
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983)). More than a scintilla exists
when the evidence “rises to a level that would enable reasonable and fair-minded people
to differ in their conclusions.” Id. (citing Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 25 (Tex.
1994)). In determining whether the non-movant has met its burden, we review the
evidence in the light most favorable to the non-movant, crediting such evidence if
reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could
not. Tamez, 206 S.W.3d at 582; City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex.
2005). 
          We review the trial court’s granting of a traditional motion for summary judgment de
novo. See Provident Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215 (Tex. 2003);
Branton v. Wood, 100 S.W.3d 645, 646 (Tex. App.–Corpus Christi 2003, no pet.). When
reviewing a traditional summary judgment, we must determine whether the movant met its
burden to establish that no genuine issue of material fact exists and that the movant is
entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); Sw. Elec. Power Co. v.
Grant, 73 S.W.3d 211, 215 (Tex. 2002); City of Houston v. Clear Creek Basin Auth., 589
S.W.2d 671, 678 (Tex. 1979). The movant bears the burden of proof in a traditional motion
for summary judgment, and all doubts about the existence of a genuine issue of material
fact are resolved against the movant. See Sw. Elec. Power Co., 73 S.W.3d at 215. We
take as true all evidence favorable to the nonmovant, and we indulge every reasonable
inference and resolve any doubts in the nonmovant’s favor. Valence Operating Co. v.
Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).
          We will affirm a traditional summary judgment only if the record establishes that the
movant has conclusively proved its defense as a matter of law or if the movant has
negated at least one essential element of the plaintiff’s cause of action. IHS Cedars
Treatment Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004); Am.
Tobacco Co. v. Grinnell, 951 S.W.2d 420, 425 (Tex. 1997); Clear Creek Basin Auth., 589
S.W.2d at 678. A matter is conclusively established if reasonable people could not differ
as to the conclusion to be drawn from the evidence. City of Keller, 168 S.W.3d at 816. 
Only when the movant has produced sufficient evidence to establish its right to summary
judgment does the burden shift to the plaintiff to come forward with competent
controverting evidence raising a genuine issue of material fact with regard to the element
challenged by the defendant. Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex.
1999); see Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995). 
          When a party moves for summary judgment under both rules 166a(c) and 166a(i)
of the Texas Rules of Civil Procedure, we will first review the trial court’s judgment under
the standards of rule 166a(i). Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 600 (Tex.
2004). If the appellant failed to produce more than a scintilla of evidence under that
burden, then there is no need to analyze whether appellee’s summary judgment proof
satisfies the rule 166a(c) burden. Id.
B.       Procedural Arguments Against the No-Evidence Motion on Dissolution and
the Value of Buck’s Interest in Queen Isabella

          Initially, we must address two procedural arguments Buck makes against Palmer’s
no-evidence motion. First, Buck argues that because Palmer’s motion cited the evidence
submitted along with the motion, we must treat the motion as a traditional motion for
summary judgment, placing the initial burden to produce evidence on Palmer. Buck cites
our decisions in Michael v. Dyke, 41 S.W.3d 746, 751 (Tex. App.–Corpus Christi 2001, no
pet.), and Graham Land & Cattle Co. v. Independent Bankers Bank, 205 S.W.3d 21, 28-29
(Tex. App.–Corpus Christi 2006, no pet.). We disagree. 
          In Michael, we held that “[w]hen it is not readily apparent to the trial court that
summary judgment is sought under rule 166a(i), the court should presume that it is filed
under the traditional summary judgment rule and analyze it according to those
well-recognized standards.” 41 S.W.3d at 751. In that case, we treated Dyke’s motion as
a traditional motion for summary judgment because it “intermixe[d] language from the
traditional summary judgment rule and the no-evidence rule, fail[ed] to clearly state under
which rule summary judgment [was] sought, fail[ed] to follow rule 166a(i) precisely by
identifying the particular elements in dispute, and attache[d] evidence that would be
appropriate for a traditional motion, but not a no-evidence motion.” Id. at 752.
          After Michael , the Texas Supreme Court decided Binur v. Jacobo, 135 S.W.3d 646,
650-51 (Tex. 2004). In that case, the court held that although it is better to file separate 
motions for traditional and no-evidence summary judgment, parties may file hybrid motions. 
Id. at 651. Furthermore, although delineating the different grounds under separate
headings would help the bench and bar, the rules do not require it. Id. Most importantly,
however, the court held that we, as reviewing courts, cannot disregard a motion for no-evidence summary judgment merely because it attaches evidence. Id. Rather, in that
circumstance, we must simply disregard the attached evidence when reviewing the no-evidence grounds unless the evidence raises a fact issue in favor of the non-movant. Id. 
          Our later holding in Graham Land & Cattle did not, and moreover could not, change
the rule in our jurisdiction back to its pre-Binur state. See 205 S.W.3d at 28-29. In
Graham Land & Cattle, we held that a motion did not raise no-evidence grounds because
it made two obscure references to the lack of evidence of an element, the references to
the lack of evidence were made within the traditional summary judgment arguments, and,
as an additional problem, the motion cited to the summary judgment evidence as
supporting the no-evidence arguments. Id. at 29. 
          Palmer’s motion for summary judgment, however, separately stated the standards
for no-evidence and traditional summary judgment and expressly stated the basis for the
no-evidence motion. Although Palmer referenced summary judgment evidence in a
separate section entitled “Facts and Argument,” Palmer’s motion clearly asserted no-evidence grounds. Binur, 135 S.W.3d at 651. Accordingly, we may not treat Palmer’s
motion as a traditional motion simply because it attached evidence; rather, we ignore
Palmer’s evidence unless it raises a fact issue. Id.
          Second, Buck argues that Palmer’s motion was defective because a no-evidence
motion may only attack a claim or defense “on which an adverse party would have the
burden of proof at trial.” Tex. R. Civ. P. 166a(i). Buck argues that Palmer’s no-evidence
arguments, that dissolution occurred and that the value of Buck’s interest in the partnership
was zero, were asserted in a defensive posture to Buck’s claims. We disagree.
          First, Palmer’s argument that the partnership was dissolved in 1995 is actually a
challenge to Buck’s standing to assert claims against him for actions he took after
dissolution. In every case, a party must have standing to litigate the matters in issue. See
Hunt v. Bass, 664 S.W.2d 323, 324 (Tex. 1984). Because standing is a prerequisite to the
maintenance of a lawsuit, a party may move for no-evidence summary judgment on his
opponent’s standing to bring suit. See Tex. R. Civ. P. 166a(i); Tex. Ass’n of Bus. v. Tex.
Air Ctrl. Bd., 852 S.W.2d 440, 444 (Tex. 1993); see also Bank of Am. v. Eisenhauer, No.
13-09-00004-CV, 2010 WL 2784031, at *6 (Tex. App.–Corpus Christi July 15, 2010, no
pet.) (mem. op.) (holding that the trial court erred by denying the defendant’s no-evidence
motion based on the plaintiff’s standing to sue). Arguments like Palmer’s—that a partner
has no right to sue another partner for breach of fiduciary duty or fraud after dissolution
except to the extent that the liability arises from winding up the partnership—raise the issue
of whether the partner has standing to sue. See Rodgers v. RAB Invs., Ltd., 816 S.W.2d
543, 546-47 (Tex. App.–Dallas 1991, no writ) (addressing a partner’s standing to sue in this
context). 
          Second, Palmer’s argument that the value of Buck’s interest in the partnership was
valued at the date of dissolution and was zero attacks Buck’s action for an accounting and
for distribution of the value of his partnership interest. Buck would have the burden at trial
to prove the value of his interest, and Palmer argues that he has no evidence to prove that
it was anything greater than zero. See Bader v. Cox, 701 S.W.2d 677, 683 (Tex.
App.–Dallas 1985, writ ref’d n.r.e.) (“Thus, to recover the value of decedent’s interest in the
dissolved partnership, Ms. Bader has the burden of proving the market value of, and
decedent’s share of, the partnership assets.”); Cauble v. Handler, 503 S.W.2d 362, 364
(Tex. Civ. App.–Fort Worth 1973, writ ref’d n.r.e.) (“We agree that the burden of proof in
this accounting case was on the plaintiff to show that Handler was indebted to the
deceased’s estate and to show the amount of such debt. Plaintiff thus had the burden to
prove the market value of the partnership assets.”). 
          Accordingly, we hold that Palmer’s no-evidence motion appropriately challenged
issues on which Buck would bear the burden of proof at trial, and it shifted the burden to
Buck to produce evidence that he had an interest in the partnership on the dates of the
alleged actions that form the basis of his claims against Palmer and the value of his
interest for which he sought distribution.


 
C.       Date of Dissolution and Buck’s Standing
          In response to Palmer’s no-evidence motion, Buck submitted his own affidavit and
several documents he claims demonstrate that after settling the Llano County litigation in
September of 1995, he continued to own a twenty percent interest in Queen Isabella and
that the partnership was not dissolved. Palmer, on the other hand, argues that Buck’s
evidence shows that in the summer of 1995, Buck expressed his intent to dissolve the
partnership. Palmer argues that Queen Isabella continued with Buck as a partner for the
sole purpose of winding up and terminating the partnership, and the settlement of the Llano
County litigation was merely part of that process. Because all of Buck’s claims for
damages were based on actions Palmer took after dissolution, when Buck no longer had
an interest in the partnership, Buck had no standing to assert claims for damages to
himself or to Queen Isabella based on these actions. These arguments require this Court
to analyze the law of dissolution, winding up, and termination of partnerships, which we will
do before addressing Buck’s evidence.
          1.       Dissolution, Winding up, and Termination of Partnerships
          The parties agree that TUPA governs this case.


         TUPA discusses three
different concepts that apply in this case: dissolution, winding up, and termination of the
partnership. TUPA § 29 (defining dissolution); id. § 30 (explaining that dissolution does not
terminate the partnership, which continues until winding up); id. § 37 (explaining right to
wind up); see Woodruff v. Bryant, 558 S.W.2d 535, 538 (Tex. Civ. App.–Corpus Christi
1977, writ ref’d n.r.e.) (citing McKellar v. Bracewell, 473 S.W.2d 542, 549 (Tex. Civ.
App.–Houston [1st Dist.] 1971, writ ref’d n.r.e.)). “Dissolution” is defined as “the change
in the relation of the partners caused by any partner ceasing to be associated in the
carrying on as distinguished from the winding up of the business.” TUPA § 29. 
          TUPA clarifies that “[o]n dissolution the partnership is not terminated, but continues
until the winding up of partnership affairs is completed.” Id. § 30. In other words, 
[g]enerally when a partnership is dissolved, the partnership continues during
the period of winding up until all preexisting matters are terminated.
Dissolution is an act that actually changes the legal relationship of the
partnership, and has nothing to do with whether or not the partnership
business is continuing or winding up. It is a technical legal concept, unlike
the concept of dissolution in other areas, such as corporations. . . . The
causes [of dissolution] set out in [section 31] are automatic and dissolution
occurs immediately upon the happening of the specified event.

Woodruff, 558 S.W.2d at 539. After dissolution, the partnership continues for the limited
purpose of winding up the affairs of the partnership. Id. “It is only upon termination that
the final partnership relationship ceases to exist.” Id. 
          Every partner has the right to dissolve the partnership, which may either be in
compliance with or in violation of the partnership agreement. Id. Dissolution may be
caused by several different acts, which are set out in TUPA section 31, and include the
following:
Dissolution is caused:
 
(1) Without violation of the agreement between the partners, 
 
(a)By the termination of the definite term or particular undertaking
specified in the agreement,
 
(b)By the express will of any partner when no definite term or
particular undertaking is specified,
 
(c)By the express will of all the partners who have not assigned
their interests or suffered them to be charged for their separate
debts, either before or after the termination of any specified
term or particular undertaking,
 
(d)By the expulsion of any partner from the business bona fide in
accordance with such a power conferred by the agreement
between the partners;
 
(2)In contravention of the agreement between the partners, where the
circumstances do not permit a dissolution under any other provision
of this Section, by the express will of any partner at any time; . . . .

TUPA § 31. Thus, under TUPA, a partner may dissolve the partnership by his express will,
which may either be in compliance with or in violation of the partnership agreement. Id. 
          When a partnership is dissolved in violation of the partnership agreement, TUPA
provides that the partners who “have not wrongfully dissolved the partnership . . . [have]
the right to wind up the partnership affairs; provided, however, that any partner, his legal
representative or his assignee, upon cause shown, may obtain winding up by the court.” 
Id. § 37. We now turn to Buck’s evidence.
          2.       Buck’s Evidence
          Buck’s evidence includes a letter dated June 16, 1995, from him to Palmer
regarding the settlement of the Llano County litigation. It states:
Further, as I have previously informed you, I have no desire to embark
into any [Queen Isabella] land development scenario with you. However, my
20% ownership in the [Queen Isabella] property will be made available to the
development entity after the resolve [sic] of the Construction Defect Lawsuit,
your payment in full to 1629 for your purchase of its 60% ownership interest,
and immediately prior to the start of any development of the [Queen Isabella]
property.

Later, on June 26, 2005, Buck sent a letter to Garcia, which stated:
I have never made an “announcement” to you, Jay Palmer, Tom
Matlock, or anyone else that I was not interested in resolving the issues
surrounding [Queen Isabella], nor that I would be willing to relinquish any
element of my rights in the existing [Queen Isabella] partnership. However,
you and Jay Palmer have been told that I have absolutely no desire
whatsoever to participate in any future development of the [Queen Isabella]
property with you and/or Jay Palmer.

          Although Buck’s affidavit states that “[e]xcept in connection with my request for relief
in this lawsuit, on no occasion have I declared dissolution of [Queen Isabella],”


 he
expressly admits that on several occasions he and Palmer “expressed our desire to
change our business relations.” He states:
Palmer and I have told each other that we did not wish to be in
business together. For example, by letter dated August 1, 1995, my
attorney, John Ray, stated, “I am advised by Mr. Buck that both he and Mr.
Palmer made it known during the July 5, 1995 Settlement Status Conference
in Llano County that neither of the gentlemen wishes to have any further
business relationships together.” . . . . Palmer expressed the same
sentiment to me by letter dated January 11, 1996.

Both of these letters are included in Buck’s summary judgment evidence.
          Buck claims that several documents executed around the same time reaffirmed the
existence of the Queen Isabella partnership and his interest in the partnership. First, he
points to an amendment to the partnership agreement executed on September 29, 1995,
which reflects that Palmer acquired 1629's sixty-percent interest in the partnership and
states that Buck is a twenty percent interest owner in Queen Isabella. Second, Buck points
to the settlement agreement resolving the Llano County litigation, which was also executed 
on September 29, 2005. The settlement agreement provides for the assignment of 1629's
interest to Palmer and provides that Palmer will own eighty percent of Queen Isabella and
Buck will own twenty percent.
          3.       Analysis
          The first question that must be answered is whether Buck dissolved the partnership
by his communications in the summer of 1995. As noted above, a dissolution may be
caused by the “express will” of a partner. TUPA § 31(1)(b), (2). The parties dispute
whether Buck dissolved the partnership through his statements that he had “no desire to
embark into any [Queen Isabella] land development scenario with [Palmer],” that he had
“absolutely no desire whatsoever to participate in any future development of the [Queen
Isabella] property” with Palmer, that he had “expressed [his] desire to change [his]
business relations” with Palmer, and that he did not wish to have “any further business
relationships together.” We hold these statements were sufficient to constitute notice of
Buck’s “express will” to terminate the partnership.
          As explained above, dissolution means “the change in the relation of the partners
caused by any partner ceasing to be associated in the carrying on as distinguished from
the winding up of the business.” Id. § 29. It is hard to imagine a more clear statement of
intent to dissolve than that expressed by Buck, where he used the precise definition of
dissolution in his statements regarding continuation of the partnership business. See id. 
He wanted to “change [his] business relations,” he did not want “any further business” with
Palmer, and he did not want to participate in any future development of the property, which
was the sole purpose of the joint venture as stated in the partnership agreement. See id. 
Under these circumstances, we hold that Buck dissolved the partnership in the summer of
1995, and the dissolution was automatic upon the making of these statements. See
Woodruff, 558 S.W.2d at 540 (holding evidence was legally sufficient to support finding of
dissolution where partner stated that she “wanted to get out of it”);


 id. at 539 (“The causes
set out in [section] 31 are automatic and dissolution occurs immediately upon the
happening of the specified event.”).



          The amendment of the partnership agreement and the settlement of the Llano
County litigation are not inconsistent with dissolution, but rather, evidence the purpose of
winding up of the partnership’s existing affairs. See TUPA § 30; Woodruff, 558 S.W.2d at
539. It is undisputed that the Llano County litigation was pending in the summer of 1995,
when Buck expressed his will to dissolve the partnership. The litigation was instituted
against Queen Isabella, and the settlement agreement necessarily required the partners
responsible for the liability on the promissory notes be a part of the settlement agreement. 
See TUPA § 15(1) (“Except as provided by Paragraph (2) of this Section, all partners are
liable jointly and severally for all debts and obligations of the partnership including those
under Sections 13 and 14); id. § 36(1) (“The dissolution of the partnership does not of itself
discharge the existing liability of any partner.”). The dissolution occurred before the
settlement in September 1995, but the settlement did not reinstate the dissolved
partnership.
          In sum, we agree that a dissolution occurred as a result of Buck’s statements in the
summer of 1995. Palmer’s motion for no-evidence summary judgment argued that all of
Buck’s causes of action were based on actions Palmer took after dissolution, at a time
when Palmer was entitled to continue the partnership and engage in new business and
when Buck no longer had an interest in the partnership. Woodruff, 558 S.W.2d at 542; see
also Nielsen v. Nielsen, No. 13-97-338-CV, 1999 WL 34973311, at *5 (Tex. App.–Corpus
Christi Aug. 19, 1999, no pet.) (not designated for publication) (“The rule is that the
fiduciary relationship between partners comes to an end as to new business commenced
after the date of dissolution. New business encompasses transactions which are neither
unfinished partnership business commenced prior to dissolution or transactions rightfully
belonging to the partnership during the wind-up stage.”). Because Buck did not present
evidence that he had an interest in the partnership after the summer of 1995, he had no
standing to maintain his suit against Palmer for new business the partnership engaged in
after dissolution.



D.       Value of Buck’s Interest in Queen Isabella
          Buck argues that his interest should be valued as of the date of the distribution,
which according to him has not yet occurred, instead of the date of dissolution. He bases
his argument on the partnership agreement and on TUPA section 38, arguing that he had
a right to insist on liquidation of the partnership’s assets and to receive his distribution from
the excess of assets over liability. See TUPA § 38. Palmer, on the other hand, argues that
Buck’s interest must be valued at the date of dissolution because Buck dissolved the
partnership in contravention of the partnership agreement,


 and Buck has no evidence
that the value at that time was more than zero. See id. Buck counters that even if the
value was set on dissolution, he was entitled to share in the settlement of liabilities and the
appreciation of joint venture property during the winding up process, and he presented
evidence of the value of the partnership property. We agree with Palmer.
          1.       Value of Partnership Interest at Dissolution or Distribution?
          As we noted earlier, dissolution may be caused by the express will of the partners,
which may be in accordance with or in violation of the partnership agreement. Id. § 31. 
Under section 38, whether dissolution was in violation of the agreement determines the
dissolving partner’s right to a distribution. Id. § 38. When a definite term has been
specified in the partnership agreement, a partner may dissolve the partnership without
violating the agreement if the term has expired at the time of dissolution. Id. § 31(1)(a). 
If the definite term has not expired, dissolution by the partner’s express will is in violation
of the agreement. Id. § 31(2). Palmer argues that Buck dissolved the partnership in
contravention of the partnership agreement because the agreement provided for a
specified term that had not expired. We agree.
          Buck submitted the partnership agreement as part of the summary judgment
evidence. It states that the purpose of Queen Isabella was to “acquire certain real property
situated in Cameron County, Texas,” which it described in a separate schedule. The term
of the joint venture is provided: “The Joint Venture shall commence as of the date hereof
and shall continue in existence for a period of FIVE (5) years, and thereafter from
year-to-year unless it is sooner terminated, liquidated, or dissolved as hereinafter
provided.” The partnership agreement was signed April 27, 1984.
          Buck argues that because the partnership commenced in 1984, the initial five-year
term had long since expired by 1995. Thus, in 1995 when the alleged dissolution occurred,
the partnership was in the middle of a year-to-year term, making dissolution an option
without violating the partnership agreement. Buck argues that the purpose of having a
partnership continue from year to year was to ensure that the expiration of the fixed term
did not cause a dissolution. Essentially, he argues that the year-to-year term does not
constitute a “fixed term” but is a mere saving provision that should be disregarded for
purposes of dissolution.
          Palmer points out, however, that although the partnership agreement states that the
partnership can be terminated prior to the expiration of a year-to-year term “as hereinafter
provided,” the agreement does not provide for a method to terminate the partnership in the
middle of the one-year additional terms. He disputes Buck’s argument that the
year-to-year provision was included merely to save the partnership from dissolving upon
the expiration of the five-year initial term, pointing out that section 23 already provides for
the continuation of a partnership as an “at will” partnership after a fixed term when there
is no express agreement to the contrary. Id. § 23 (“When a partnership for a fixed term or
particular undertaking is continued after the termination of such term or particular
undertaking without any express agreement, the rights and duties of the partners remain
the same as they were at such termination, so far as is consistent with a partnership at
will.”). 
          When possible, we are required to give effect to all the terms of a contract so that
none of the provisions are rendered meaningless. Kelley-Coppedge, Inc. v. Highlands Ins.
Co., 980 S.W.2d 462, 464 (Tex. 1998). Section 23 expressly contemplates that parties
may agree to a contingent term upon the expiration of an initial fixed term to avoid
becoming an “at will” partnership, and that is what the parties did in this case. Thus,
section 23 requires this Court to assume that the partnership agreement fixed successive
one-year terms following the expiration of the initial five-year term and was not merely
included to prevent dissolution upon the expiration of the initial term. Id. § 23. We will not
read the year-to-year provision in the contract as mere surplusage. Kelley-Coppedge, Inc.,
980 S.W.2d at 464. Because the dissolution occurred in the middle of a fixed, year-long
term, Buck’s dissolution violated the partnership agreement. Id. §31(2). 
          Section 38 provides for the application of partnership property after dissolution and
distinguishes between partners who have dissolved the partnership in contravention of the
partnership agreement and those who have not:
(1)When dissolution is caused in any way, except in contravention of the
partnership agreement, each partner, as against his co-partners and
all persons claiming through them in respect of their interests in the
partnership, unless otherwise agreed, may have the partnership
property applied to discharge its liabilities, and the surplus applied to
pay in cash the net amount owing to the respective partners. But if
dissolution is caused by expulsion of a partner, bona fide under the
partnership agreement and if the expelled partner is discharged from
all partnership liabilities, either by payment or agreement under
Section 36(2), he shall receive in cash only the net amount due him
from the partnership.
 
(2)When dissolution is caused in contravention of the partnership
agreement the rights of the partners shall be as follows:
 
(a)Each partner who has not caused dissolution wrongfully shall
have,
 
(I)All the rights specified in paragraph (1) of this Section,
and
 
(II)The right, as against each partner who has caused the
dissolution wrongfully, to damages for breach of the
agreement.
 
(b)The partners who have not caused the dissolution wrongfully,
if they all desire to continue the business in the same name,
either by themselves or jointly with others, may do so, during
the agreed term for the partnership and for that purpose may
possess the partnership property, provided they secure the
payment by bond approved by the court, or pay to any partner
who has caused the dissolution wrongfully, the value of his
interest in the partnership at the dissolution, less any damages
recoverable under clause [2(a)(II)] of this Section, and in like
manner indemnify him against all present or future partnership
liabilities.
 
(c)A partner who has caused the dissolution wrongfully shall
have:
 
(I)If the business is not continued under the provisions of
paragraph (2b) all the rights of a partner under
paragraph (1), subject to clause [2(a)(II)], of this
Section;
 
(II)If the business is continued under (2b) of this Section,
the right as against his co-partners and all claiming
through them in respect of their interests in the
partnership, to have the value of his interest in the
partnership, less any damages caused to his
co-partners by the dissolution, ascertained and paid to
him in cash, or the payment secured by bond approved
by the court, and to be indemnified against all existing
liabilities of the partnership; but in ascertaining the
value of the partner’s interest the value of the good-will
of the business shall not be considered.
Id. § 38. Under section 38(2)(b), because Buck
wrongfully dissolved the partnership, Palmer was
entitled to continue the partnership but was required to
pay Palmer “the value of his interest in the partnership
at the dissolution, less any damages recoverable under
clause [2(a)(II)] of this Section, and in like manner
indemnify him against all present or future partnership
liabilities.” Id. § 38(2)(b) (emphasis added). Palmer
elected to continue the partnership; therefore, Palmer
was required to pay Buck the value of his interest in the
partnership at dissolution and was also required to
indemnify against “all present or future partnership
liabilities.” Id. 
          Buck points to the partnership agreement and argues that the agreement itself
requires distributions to be made “using the property’s fair market value as of the time of
distribution, as the basis for making the distribution.” (emphasis added). Thus, because
there has not been a distribution, Buck is entitled to his share of the property’s current fair
market value. We disagree that this provision requires Buck’s value to be calculated at the
date of distribution instead of the date of dissolution. 
          The agreement provides that “[t]he Joint Venture may be terminated upon any date
specified in a notice of termination, signed by sixty percent (60%) in interest, not in
numbers, of the Joint Venturers. The death, incapacity, or dissolution of a Joint Venturer
shall have no effect on the life of the Joint Venture, which shall continue.” Thus,
dissolution under the agreement would not terminate the joint venture. 
          In contrast, the provisions for distribution of the partnership assets upon termination,
which the agreement says can only be by a vote of sixty percent of the interests,
contemplate liquidation:
Upon such termination, the assets of the Joint Venture shall be
applied as follows: to payment of the outstanding Joint Venture liabilities,
although an appropriate reserve may be maintained in the amount
determined by the manager or Trustee-in-Liquidation for any contingent
liability until said contingent liability is satisfied, and the balance of such
reserve, if any, shall be distributed together with any other sum remaining
after payment of the outstanding Joint Venture liabilities to all of the Joint
Venturers as their interest appears on Exhibit “A” unless otherwise provided
herein.

In fact, the language Buck relies upon actually discusses the situation where a Joint
Venturer demands payment of his interest by use of the joint venture’s property: 
No Joint Venturer shall be entitled to demand a distribution be made
to him in Joint Venture Property, but the Manager may make or direct
property distributions to be made, using the property’s fair market value as
of the time of distribution, as the basis for making the distribution.

Thus, the termination and distribution provisions do not apply to this situation, where Buck
caused a dissolution of the partnership, but was not entitled to insist on termination. We
find nothing in the agreement that requires Buck’s interest be paid as of the date of the
“distribution” as opposed to the date of dissolution as required by section 38. See id. In
the absence of any provisions to the contrary, section 38 applies and requires the value
be set at the date of dissolution. See id. 
          2.       Buck’s Evidence of the Value at Dissolution
          As we held above, Buck dissolved the partnership, at the very latest, on July 5,
1995. First, Buck points to appraisals of Queen Isabella’s property that valued the property
at $4,000,000. The appraisals he references provide estimates of the market value as of
June 30, 2000 and as of July 15, 2008, neither of which are the dates of dissolution. 
          Second, Buck points to a meeting he attended on December 15, 1993, arguing that
Palmer disregarded an appraisal conducted in 1992 and valued the property at
$1,500,000. Again, the dissolution occurred in 1995, not in 1992 or 1993. And in any
event, in 1992, Texas Trust obtained a judgment against Queen Isabella for
$14,865,977.80 and against Buck and Palmer individually for forty percent of that amount,
or $5,946,391.12, under the terms of their guaranty. Thus, even if we accepted the value
stated by Palmer in December 1993, the partnership’s liabilities at that time exceeded the
estimated value by more than $13 million. Buck then argues that in 1998, the property had
increased in value to $2,060,000. Yet again, 1998 is not the relevant date. 
          Although Buck points to the September 29, 1995 settlement agreement, which
reduced the partnership’s liabilities to a $600,000 note payable to 1629, Buck does not
provide any evidence of the value of the partnership’s real property at that time. Buck
points to other evidence in the record that he claims “refers to other property owned by the
joint venture, for which Palmer fails to account, including recovery in the construction
defects litigation.” The evidence shows that in the construction defects litigation, one of
the defendants settled the suit with Palmer, Queen Isabella, and 1629 for $195,000. The
evidence does not, however, show how these amounts were allocated between these
parties. Buck participated in the settlement as well, receiving $5,000. Because the only
evidence Buck presented showed that the partnership had at least $600,000 in debt, but
none of Buck’s evidence provides a value for the partnership property at the time of
dissolution, the evidence shows nothing more than a negative value for the partnership. 
Thus, the trial court did not err in granting summary judgment that Buck take nothing on
all his claims. We overrule Buck and Queen Isabella’s first issue.   V. Discovery of Palmer’s Financial Statements
          By their third issue, Buck and Queen Isabella argue that the trial court erred by
denying them discovery of Palmer’s financial statements, which they argue would have
shown the value of Queen Isabella at the date of the alleged dissolution. For this reason,
they argue that the summary judgment should be reversed. We disagree.
          “If the trial court abuses its discretion in a discovery ruling, the complaining party
must still show harm on appeal to obtain a reversal.” Ford Motor Co. v. Castilllo, 279
S.W.3d 656, 667 (Tex. 2009) (citing Tex. R. App. P. 44.1(a)). An error is harmful if it
“probably caused the rendition of an improper judgment” or “probably prevented the
appellant from properly presenting the case to the court of appeals.” Tex. R. App. P.
44.1(a).
          The trial court reviewed the financial statements in camera, and so have we. The
documents submitted to the court as responsive to the discovery requests include Palmer’s
personal financial statements for the following dates: December 31, 1999; August 31,
2000; December 31, 2000; July 31, 2001; December 31, 2001; March 31, 2002; and July
31, 2003. The relevant time period for valuing Queen Isabella’s property was the date of
dissolution, in the summer of 1995, which was more than four years prior to the first
financial statement appearing in the record. Thus, Buck has failed to show that the trial
court’s denial of his discovery in this regard has caused any harm, as this evidence would
not have supported his claim that the value of Queen Isabella was greater than zero at the
date of dissolution. For this reason, we cannot say that the trial court abused its discretion
in denying discovery of Palmer’s financial records. Martin v. Commercial Metals Co., 138
S.W.3d 619, 624 (Tex. App.–Dallas 2004, no pet.) (holding that the non-movant failed to
show “how any of the information he sought could have changed the outcome of the
summary judgment process,” and thus “failed to show how he was harmed by the lack of
further discovery”). Accordingly, we overrule Buck and Queen Isabella’s third issue.
VI. Conclusion
          Having overruled all of Buck and Queen Isabella’s issues, we affirm the trial court’s
summary judgment.
 
                                                                               _______________________________
                                                                               GINA M. BENAVIDES,
                                                                               Justice
 
Delivered and filed the
21st day of December, 2010.